1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   DANIEL ESPINOZA,

CASE NO. C17-1709JLR

11                           Plaintiff,

ORDER ON DEFENDANTS'
DAUBERT MOTION AND
MOTION FOR SUMMARY
JUDGMENT

12       v.

13   CITY OF SEATTLE, et al.,

14                           Defendants.

## I.   INTRODUCTION

16        Before the court are (1) Defendants City of Seattle and Lieutenant Thomas

17   Mahaffey's (collectively, "Defendants") motion to exclude Plaintiff Daniel Espinoza's

18   damages expert Erick West (MTE (Dkt. # 73)) and (2) Defendants' motion for summary

19   judgment (MSJ (Dkt. # 75)).  Mr. Espinoza opposes both motions.  (*See* MTE Resp. (Dkt.

20   # 82); MSJ Resp. (Dkt. # 81).)  The court has reviewed the motions, the parties'

21   submissions in support of and in opposition to the motions, the relevant portions of the

22   //

1  record, and the applicable law.  Being fully advised, the court GRANTS Defendants'

2  motion for summary judgment and DENIES as moot Defendants' motion to exclude.[1]

## II.   BACKGROUND

**A.   Mr. Espinoza's Military and Law Enforcement Background**

5        The gravamen of this lawsuit is Mr. Espinoza's assertion that his employer, the

6  Seattle Police Department ("SPD"), discriminated against him based on his status as a

7  member of the United States Marine Corps Reserve ("USMCR").  SPD hired Mr.

8  Espinoza on March 5, 1998.  (Espinoza Decl. (Dkt. # 81-1) ¶ 3.)  SPD assigned Mr.

9  Espinoza to the Patrol Operations Bureau ("Patrol Operations"), West Precinct, on the

10  second watch, which meant that his shift was from 11:00 AM to 8:00 PM.  (*See* 1st Seals

11  Decl. (Dkt. # 76) ¶ 4, Ex. 3 ("Espinoza Dep."[2]) at 18:13-19:8.)

12  //

---

[1] Defendants request oral argument on their summary judgment motion (*see* MSJ at 1) but not their motion to exclude (*see* MTE at 1).  Mr. Espinoza does not request oral argument on either motion.  (*See* MSJ Resp. at 1; MTE Resp. at 1.)  Oral argument is not necessary where the non-moving party suffers no prejudice.  *See Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984); *Mahon v. Credit Bureau of Placer Cty. Inc*., 171 F.3d 1197, 1200 (9th Cir. 1999) (holding that no oral argument was warranted where "[b]oth parties provided the district court with complete memoranda of the law and evidence in support of their respective positions," and "[t]he only prejudice [the defendants] contend they suffered was the district court's adverse ruling on the motion.").  "When a party has an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument]." *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp*., 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*).  Here, the issues have been thoroughly briefed by the parties, and oral argument would not be of assistance to the court.  *See* Local Rules W.D. Wash. LCR 7(b)(4).  Accordingly, the court DENIES Defendants' request for oral argument on their summary judgment motion.

[2] Portions of Mr. Espinoza's deposition are also in the record as Exhibit A to the Tymczyszyn Declaration.  (*See* Tymczyszyn Decl. (Dkt. # 81-2) ¶ 7, Ex. A.)  The court cites to Mr. Espinoza's deposition as "Espinoza Dep." wherever it appears in the record.

1    From the time of his hiring in 1998 until early 2020, Mr. Espinoza served as a

2    member of the USMCR.  (*See* Espinoza Decl. ¶ 5.)  Mr. Espinoza informed SPD at the

3    time of his hiring that he was a member of the USMCR.  (*See* 1st Seals Decl. (Dkt. # 76)

4    ¶ 15, Ex. 14.)  Mr. Espinoza's duties with USMCR required that he "participate in

5    military duty, typically one weekend a month, conduct military duty for multiple weeks

6    for training and readiness purposes, and, from time-to-time, deploy overseas to serve in

7    combat."  (Espinoza Decl. ¶ 6.)  Mr. Espinoza was called to active duty four times during

8    his employment with SPD.  (*See id.* ¶¶ 34-37.)

9    **B.    Mr. Espinoza's Allegations of "Anti-Military Animus" at SPD**

10    Mr. Espinoza makes clear in his response to Defendants' summary judgment

11    motion that his claims in this lawsuit relate only to actions taken by SPD between 2012

12    and the present (*see* MSJ Resp. at 14 ("Mr. Espinoza's claims arise only from 2012 to

13    present[.]")), and that his discrimination claims "are founded on Defendants' failure to

14    promote him to [SPD's] [M]otorcycle squad" on a number of different occasions (*see id.*

15    at 16).  However, his opposition and declaration also detail a number of instances of

16    alleged "anti-military animus" by SPD beyond SPD's decisions on Mr. Espinoza's

17    applications to the Motorcycle Unit.  (*See, e.g.*, *id.* at 9-14; Espinoza Decl. ¶¶ 6-10,

18    13-23, 25, 27-37.)  Thus, in the interest of completeness, the court details each alleged

19    instance of discrimination or anti-military animus Mr. Espinoza identifies.

20    1.    2006 Bicycle Unit Transfer Request

21    Mr. Espinoza alleges that he requested a transfer to SPD's Bicycle Unit in 2006

22    that SPD denied.  (*See* Espinoza Dep. at 28:12-17; Espinoza Decl. ¶ 7.)  Although SPD

1    policy in place at the time required officers initiate a transfer request by submitting a

2    written memorandum (*see* Espinoza Dep. at 29:3-10; 1st Seals Decl. ¶ 22, Ex. 21 at

3    SCL-Espinoza077911), SPD has no record of Mr. Espinoza's request to transfer to the

4    Bicycle Unit in 2006 or SPD's denial of that transfer request (*see* MSJ at 18).  Mr.

5    Espinoza believes that his status as a member of the USMCR negatively impacted his

6    application based on his allegation that a SPD Bicycle Unit sergeant, Fred Ibuki, asked

7    Mr. Espinoza if he was a member of USMCR sometime after Mr. Espinoza requested a

8    transfer to the Bicycle unit.  (*See* Espinoza Decl. ¶¶ 8-9.)  Mr. Espinoza does not know if

9    Mr. Ibuki was on the hiring panel for the Bicycle Unit, he does not know who was hired

10   on to the Bicycle Unit, and he does not know why he was not selected for transfer.

11   (Espinoza Dep. at 31:14-32:8.)

12        2.       Homeland Security, Bomb, and Narcotics Unit Transfer Requests

13        Mr. Espinoza also alleges that he requested transfers to SPD's Homeland Security,

14   Bomb, and Narcotics Units that SPD denied.  (*See* Espinoza Decl. ¶ 10.)  Mr. Espinoza

15   alleges that he applied for the Homeland Security Unit in 2006, but he could not recall

16   when he applied to the Narcotics or Bomb Units.  (*See* Espinoza Dep. at  36:2-7 (stating

17   that he applied for transfer to the Homeland Security Unit in 2006), 32:16-33:3

18   (estimating that he applied to the Bomb Unit "sometime after 2006"), 33:17-25 (stating

19   that he "[c]ouldn't be sure" when he applied for a transfer to the Narcotics Unit).)  The

20   SPD has no record of Mr. Espinoza's transfer requests for the Bomb and Homeland

21   Security Units (*see* MSJ at 18), but Mr. Mahaffey was a sergeant with the Narcotics Unit

22   //

in 2006 or 2007 and he recalls Mr. Espinoza's application for transfer into that unit around that time (*see* 1st Seals Decl. ¶ 23, Ex. 22 ("Mahaffey Dep"[3]) at 46:23-47:12).

Mr. Espinoza's declaration alleges that the SPD filled the positions for the Bomb, Narcotics, and Homeland Security Units with "officers who were less qualified and experienced" than him. (Espinoza Decl. ¶ 10.) He also assets that he knows "a majority of the police officers who were hired into those positions and they were not members of the military reserves." (*Id.*) During his deposition, however, Mr. Espinoza testified that he did not know the other officers who applied for these positions or how his qualifications measured up to those of the other applicants. (*See* Espinoza Dep. at 33:11-16, 35:20-36:1, 36:16-23.) He testified that he did not know who SPD hired for the homeland security or narcotics groups, but he knew an officer named "Rainford" was selected for the Bomb Unit. (*Id.* at 37:3-6, 40:3-15.) Mr. Espinoza testified that Mr. Rainford had "quite a bit less" seniority than he did at the time that SPD selected Mr. Rainford for the bomb squad (*see id.* at 37:13-15), but Mr. Espinoza does not identify any evidence the record that details Mr. Rainford's service time at SPD outside of Mr. Espinoza's own testimony. (*See generally* MSJ Resp.) Mr. Espinoza also does not identify any evidence showing whether or not Mr. Rainford was a member of the military at the time of his transfer to the Bomb Unit.

//

---

[3] Portions of Mr. Mahaffey's deposition are also in the record as Exhibit F to the Tymczyszyn Declaration. (*See* Tymczyszyn Decl. ¶ 12, Ex. F.) The court cites to Mr. Mahaffey's deposition as "Mahaffey Dep." wherever it appears in the record.

1          3.      Motorcycle Unit Transfer Requests

2          Mr. Espinoza's unsuccessful efforts to transfer to SPD's Motorcycle Unit from

3   2012 to 2018 sit at the center of this lawsuit.  (*See* MSJ Resp. at 16 ("Mr. Espinoza's

4   USERRA and WLAD discrimination and retaliation claims are founded on Defendants'

5   failure to promote him to the motorcycle squad.").)  SPD policy requires officers

6   interested in the Motorcycle Unit complete a training course in order to be considered for

7   transfer to that unit.  (*See* 1st Seals Decl. ¶ 25, Ex. 24 at SCL-Espinoza001500-501; *id.*

8   ¶ 26, Ex. 25.)  Specifically, the policy dictates that "[u]pon successful completion of [a]

9   two-week course of instruction, student riders are placed on an eligibility list for

10  consideration for future assignment to a motorcycle squad."  (*See id.* ¶ 25, Ex. 24 at

11  SCL-Espinoza001500.)  In addition to the training requirements, assignment to the

12  Motorcycle Unit requires satisfaction of several criteria, including an acceptable work

13  and disciplinary record.  (*See id.* ¶ 26, Ex. 25.)  Mr. Espinoza took and passed the

14  two-week Motorcycle training course in August 2012.  (Espinoza Decl. ¶ 11.)

15         Mr. Espinoza alleges that he first applied for a transfer to the Motorcycle Unit in

16  August 2012.  (*See* MSJ Resp. at 1-2; Espinoza Decl. ¶ 9.)  The Motorcycle Unit is

17  within the Special Operations Bureau ("Special Operations"), not Patrol Operations

18  where Mr. Espinoza was stationed at the time he passed the Motorcycle Unit training

19  course.  (*See* Mahaffey Dep. 60:13-61:4.)  To request a transfer to a different operations

20  bureau, the officer seeking transfer submits a memorandum to the desired unit and the

21  Assistant Chiefs of the two bureaus decide whether to approve it.  (*See id.*; 1st Seals

22  Decl. ¶ 24, Ex. 23 ("Wilske Dep.") at 24:8-24; Espinoza Dep. at 64:13-65:5.)  Although

1   Mr. Espinoza asserts he submitted a memorandum to transfer to the Motorcycle Unit in

2   2012 to a Special Operations lieutenant named "Mike," Mr. Espinoza acknowledges that

3   the lieutenant informed him in 2014 that SPD had no record of his 2012 transfer request.

4   (*See* Espinoza Dep. at 63:14-64:12.)  Neither party has submitted the transfer

5   memorandum Mr. Espinoza alleges he submitted in 2012 as evidence in the record.

6        Mr. Espinoza asserts that he requested transfer to the Motorcycle Unit for a second

7   time in August 2014, but Mr. Mahaffey denied his request.  (*See* Espinoza Decl. ¶ 12.)

8   Neither Mr. Espinoza nor the SPD submit any written record of Mr. Espinoza's request to

9   transfer to the Motorcycle Unit.  Mr. Espinoza asserts that he sent his memorandum

10  directly to "Mike"—the same Special Operations lieutenant to whom Mr. Espinoza

11  alleges he sent his 2012 transfer memorandum.  (*See* Espinoza Dep. at 63:14-64:12.)  Mr.

12  Espinoza testified that he believes Mr. Mahaffey denied his 2014 transfer request because

13  "the people" in the Motorcycle Unit kept asking Mr. Espinoza when he would join their

14  unit, which suggested to Mr. Espinoza that Mr. Mahaffey and Patrol Operations were

15  preventing him from transferring to the Motorcycle Unit.  (*See id.* at 65:14-66:9.)

16       Mr. Mahaffey was Mr. Espinoza's indirect supervisor from May 2014 until

17  January or February 2015.  (*See* Mahaffey Dep. at 59:20-25.)  Mr. Mahaffey testified that

18  he did not receive notification that Mr. Espinoza wanted to transfer to the Motorcycle

19  Unit in 2014, did not have any conversations with anyone about Mr. Espinoza

20  transferring to the Motorcycle Unit in 2014, and did not deny a request from Mr.

21  Espinoza to transfer to the Motorcycle Unit in 2014.  (*See id.* at 66:3-20.)  Regardless,

22  Mr. Mahaffey testified that even if he had received a transfer request from Mr. Espinoza,

1    he had "no control or say" over Mr. Espinoza's request to transfer to the Motorcycle Unit

2    because Mr. Mahaffey was only a lieutenant at the time and the decision to transfer from

3    one bureau to another is left to the Assistant Chiefs of Patrol Operations and Special

4    Operations.  (*See id.* at 60:13-61:4; *see also id.* at 66:13-20 ("And as I stated before, the

5    process that we use for transfer, I would not have had that authority to deny any of his

6    transfer requests.").)

7        Mr. Espinoza alleges that he requested transfer to the Motorcycle Unit again in

8    December 2014 and Mr. Mahaffey again denied his request.  (Espinoza Decl. ¶ 24.)

9    Neither party submits any written evidence to corroborate Mr. Espinoza's assertion that

10    he applied to the Motorcycle Unit.  Mr. Mahaffey alleges that he did not receive or deny

11    a request to transfer from Mr. Espinoza at any point in 2014.  (*See* Mahaffey Dep. at

12    66:9-20.)

13        Mr. Espinoza asserts that he continued making attempts to transfer into the

14    Motorcycle Unit that were rebuffed by Mr. Mahaffey in 2015.  (Espinoza Decl. ¶ 26.)

15    Unlike Mr. Espinoza's previous transfer requests, the parties submitted evidence

16    corroborating Mr. Espinoza's assertion that he attempted to transfer to the Motorcycle

17    Unit in 2015 and was considered by the unit for an available opening.  (*See, e.g.*, 1st

18    Seals Decl. ¶¶ 40-41, Exs. 39-40.)  At some point in 2015, a lieutenant from the

19    Motorcycle Unit, Lieutenant Kuehn, asked Mr. Mahaffey if Mr. Mahaffey had any

20    concerns about Mr. Espinoza. (*See* Mahaffey Dep. at 101:5-24.)  Mr. Mahaffey told Mr.

21    //

22    //

1    Kuehn about a number of disciplinary issues with Mr. Espinoza that occurred in 2014.[4]

2    (*See id.*; *see also* Espinoza Decl. ¶ 26.)  Ultimately, the Motorcycle Unit ranked three

3    other officers, Gregory Rice, Eric Daylong, and Arthur Garza as the top three candidates

4    for the 2015 vacancy.  (*See* 1st Seals Decl. ¶ 40, Ex. 39.)  Mr. Espinoza testified that he

5    does not know how his personnel file compared to the personnel files of these three

6    officers.[5]  (*See* Espinoza Dep. at 220:20-22, 221:20-22, 222:4-6.)

7         Although Mr. Espinoza does not allege that he attempted to transfer to the

8    Motorcycle Unit in 2016 (*see generally* Espinoza Decl.), the evidence shows that the

9    Motorcycle Unit continued to consider him for vacancies during that time (*see id.* ¶¶ 44,

10    46, Exs. 43, 45).  In September 2016, Captain Eric Sano, captain of the Motorcycle Unit

11    at the time, asked Assistant Chief for Patrol Operations Steve Wilske to release Mr.

12    Garza and Gary Davenport from Patrol Operations and approve their transfer to the

13    Motorcycle Unit.  (*See id.* ¶ 44, Ex. 43.)  Mr. Garza was also a top candidate from the

14    2015 transfer process.  (*See id.* ¶ 40, Ex. 39.)  Mr. Sano ranked the other officers who

15    qualified for transfer to the Motorcycle Unit, including Mr. Espinoza.  (*See id.* ¶ 44, Ex.

16    43.)  Mr. Espinoza ranked seventh of thirteen because he did not volunteer frequently,

17    _____

18    [4] The court addresses Mr. Espinoza's disciplinary record in detail, below.  *See infra* § II.C.

19    [5] The record does not indicate which officer SPD selected for the Motorcycle Unit.

20    Defendants allege that a November 2015 email shows that SPD selected Mr. Rice for the position (*see* MSJ at 10 (citing 1st Seals Decl. ¶ 41, Ex. 40)), but the court finds that the cited email makes no mention of who SPD ultimately hired to fill the Motorcycle Unit vacancy. Indeed, officers in the Motorcycle Unit sent the internal SPD memorandum identifying Mr. Rice,

21    Mr. Daylong, and Mr. Garza as the top candidates for transfer to the Motorcycle Unit in December 2015—after the email that Defendants allege shows that the Motorcycle Unit hired

22    Mr. Rice for the position.  (*Compare* 1st Seals Decl. ¶ 40, Ex. 39 *with id.* ¶ 41, Ex. 40.)

1    and Mr. Sano had "concerns due to recent [Office of Professional Accountability]

2    findings." (*See id.*)  Mr. Sano's email made no mention of any of the candidates'

3    positions in the military reserves and did not indicate that reserve status, if any, impacted

4    the selection process. (*See id.*)  In fact, although Mr. Sano did not mention the

5    candidates' military status in his email, Mr. Garza was an active member of the U.S.

6    Army National Guard at some point during his employment with SPD and received leave

7    for deployment in 2004 and 2005.[6] (*See id.* ¶ 45, Ex. 44.)

8         On June 10, 2018—after Mr. Espinoza filed this lawsuit—Mr. Sano requested that

9    the Assistant Chiefs of Special Operations and Patrol Operations approve Mr. Espinoza

10   for transfer to the Motorcycle Unit. (*See id.* ¶ 50, Ex. 49.)  Mr. Espinoza was officially

11   transferred to the Motorcycle Unit on August 8, 2018. (*See id.* ¶ 51, Ex. 50.)  His transfer

12   confirmation notice indicated that he was transferred due to a "[s]taffing [n]eed" and that

13   he was selected because he was "[number] 1 on [the] traffic list (motors) to come in."

14   (*See id.*)

15        4.    SPD Service Credits Dispute

16        Mr. Espinoza asserts that the SPD "denied him the opportunity to make

17   contributions or apply service credits to [his] retirement account" for periods during

18   which Mr. Espinoza was deployed on active duty with USMCR in 2003, 2005, 2011, and

19   2012. (*See* Espinoza Decl. ¶¶ 34-37.)  Mr. Espinoza is a vested participant in the Law

20   Enforcement Officers and Fire Fighters ("LEOFF 2") retirement plan. (*See id.* ¶ 33.)

21

22   _____

     [6] The record does not indicate whether Mr. Garza was a member of the U.S. Army
     National Guard in 2015 or 2016 when he was a top candidate for the Motorcycle Unit.

1    The LEOFF 2 plan is a retirement system for Washington law enforcement officers and

2    fire fighters, administered by the State of Washington Department of Retirement Systems

3    ("DRS").  *See* RCW 41.26.040 (creating LEOFF 2 retirement plan); RCW 41.50.055

4    (stating that LEOFF 2 retirement plan shall be administered by DRS).

5            Mr. Espinoza ultimately received service credits for his military absences, but not

6    until June 2018.  (*See* 1st Seals Decl. ¶ 14, Ex. 13.)  Although Mr. Espinoza alleges SPD

7    "denied" him the right to receive service credits (*see* Espinoza Decl. ¶¶ 34-37), SPD

8    informed Mr. Espinoza in 2012 that he could be eligible for service credits for his

9    military duty, but that he needed to contact LEOFF 2 membership services to determine

10   whether he was eligible for the additional service credits (1st Seals Decl. ¶ 5, Ex. 4).

11   Despite receiving this information from SPD, Mr. Espinoza did not request service credit

12   from SPD or DRS for these periods of military leave until June 2017.  (*See* Espinoza

13   Dep. at 165:3-16.)  In June 2017, Mr. Espinoza called DRS to inquire about service credit

14   for time spent on active duty and submitted proof of his military duty.  (*See id.*; 1st Seals

15   Decl. ¶ 9, Ex. 8.)  After Mr. Espinoza contacted DRS to request service credits, DRS

16   notified SPD and asked for information to process his request.  (*See* 1st Seals Decl. ¶ 10

17   Ex. 9; *id.* ¶ 11, Ex. 10 ("DiCione Dep.") at 53:4-17.)  SPD sent DRS the requested

18   information the day after it received the request.  (*See* 1st Seals Decl. ¶ 12, Ex. 11.)  Once

19   DRS received the necessary information from both Mr. Espinoza and SPD, SPD had to

20   wait for DRS to submit an invoice to SPD so that SPD could submit the appropriate

21   employer contribution to DRS.  (*See* DiCione Dep. at 54:19-55:6.)  SPD received an

22   invoice for contributions for Mr. Espinoza on May 1, 2018 (*see* 1st Seals Decl. ¶ 13, Ex.

12) and paid the invoice on June 14, 2018 (*see id.* ¶ 14, Ex. 13).  DRS then updated Mr.

Espinoza's retirement account to reflect service credit for his military absences in 2003,

2005, 2011 and 2012.  (*See id.* ¶ 7, Ex. 6.)  Mr. Espinoza acknowledges that he now has

received full service credit for his military duty.  (Espinoza Dep. at 173:24-174:2.)

> 5. <u>Military Leave</u>

Mr. Espinoza asserts that SPD expressed frustration with the amount of military

leave that Mr. Espinoza took to perform his military obligations as a member of USMCR.

(*See* Espinoza Decl. ¶¶ 14-17.)  The specific SPD policy that Mr. Espinoza takes issue

with is known as "circling furloughs."  SPD refers to regular days off as "furlough days."

(*See* Espinoza Dep. at 73:11-12.)  Pursuant to SPD policy, officers may work on a

furlough day by "circling" the furlough day on the watch calendar.  (*See* 1st Seals Decl.

¶ 52, Ex. 51 at § 4.010(12); Espinoza Dep. at 76:21-77:4.)  Although SPD officers accrue

regular furlough time that they are entitled to use at their discretion, circling furlough

days allows officers to "trade" a regularly scheduled day off for a scheduled work day

without spending any accrued furlough time.  (*See* 1st Seals Decl. ¶ 32, Ex. 31

("Zwaschka Dep."[7]) at 23:21-24:19.)  SPD policy requires officers to have supervisor

approval to circle furlough days.  (*See* 1st Seals Decl. ¶ 52, Ex. 51 at § 4.010(12);

Espinoza Dep. at 126:21-127:7.)

*//*

---

[7] Portions of Mr. Zwaschka's deposition are also in the record as Exhibit G to the Tymczyszyn Declaration.  (*See* Tymczyszyn Decl. ¶ 13, Ex. G.)  The court cites to Mr. Zwaschka's deposition as "Zwaschka Dep." wherever it appears in the record.

Mr. Espinoza alleges that the SPD made it difficult for him to circle furlough days to perform his military duties beginning in September 2014, when SPD assigned him to a new supervisor, Sergeant Andrew Zwaschka.  (*See* Espinoza Decl. ¶¶ 13-15.)  Mr. Espinoza does not submit any evidence that SPD ever interfered with his attendance at a military obligation or refused to grant him leave to attend a military obligation.  (*See generally* MSJ Resp.; Espinoza Decl.)  However, according to Mr. Espinoza, he informed Mr. Zwaschka that he designated his military reserve obligations on the calendar by circling his military reserve days as furlough days and explained to Mr. Zwaschka that his obligations with USMCR required him to be gone "regardless of whether or not [he] designated that leave as a furlough."  (*See* Espinoza Decl. ¶¶ 14-15.)  Mr. Espinoza alleges that Mr. Zwaschka "negatively reacted" to the news that Mr. Espinoza circled furlough days for his military duties in a way that led Mr. Espinoza to believe that SPD was "frustrated with the amount of military leave that [he] was taking."  (*See id.* ¶ 14.)  Mr. Espinoza said that Mr. Zwaschka instructed him to talk to Mr. Mahaffey about circling furlough days.  (*See id.* ¶ 16.)  According to Mr. Espinoza, he told Mr. Mahaffey that SPD was discriminating against him based on his military status and showed Mr. Mahaffey a copy of the Uniformed Services Employment and Reemployment Rights Act ("USERRA" or "the Act").  (*See id.*)  After that conversation, Mr. Espinoza asserts that he was allowed to circle furlough days for military obligations, but that he believed Mr. Mahaffey was "not pleased" with him.  (*See id.*)

The parties' deposition testimony tells slightly different stories about Mr. Espinoza's efforts to circle furlough days.  Mr. Espinoza testified that he showed Mr.

1    Zwaschka and Mr. Mahaffey a copy of "a couple lines" from USERRA, instead of the

2    entire Act.  (*See* Espinoza Dep. at 81:1-82:9.)  Mr. Mahaffey contends that Mr. Espinoza

3    never discussed circling furlough days with him, brought a military discrimination

4    complaint to him, or showed him a copy of USERRA.  (*See* Mahaffey Dep. at

5    67:8-68:14.)  In fact, Mr. Mahaffey testified that he was not aware of the USERRA's

6    parameters until after he was served in this lawsuit.  (*See id.* at 68:15-25.)  Mr. Mahaffey

7    also testified that SPD granted its officers 21 days of paid military leave per year and

8    officer could also use their discretionary furlough days to cover military obligations once

9    paid military time ran out.  (*See id.* at 68:24-69:6.)  He testified that he had a number of

10   officers under his command with military obligations, and that his direction to the

11   supervisors under his command was to "do everything we could to make sure people

12   could meet their military obligations."  (*See id.* at 69:7-22.)

13           Mr. Zwaschka testified that he does not recall his exact conversation with Mr.

14   Espinoza regarding circling furloughs for military leave, but he does remember that

15   ensuring that Mr. Espinoza came to work on the days he was scheduled to work became

16   an issue.  (*See* Zwaschka Dep. at 19:1-15.)  According to Mr. Zwaschka, circling

17   furlough days was a privilege that needed to be approved by a supervisor so that the

18   supervisor could ensure that the officer's proposal for trading work days did not result in

19   unbalanced staffing.  (*See id.* at 17:15-19:25, 25:19-26:19.)  Moreover, Mr. Zwaschka

20   testified that when Mr. Espinoza circled furlough days and came to work on days on

21   which Mr. Zwaschka was not there to supervise him, other sergeants in the department

22   gave Mr. Espinoza poor performance reviews.  (*See id.* at 25:19-26:19.)  These reviews

1    made Mr. Zwaschka wary of allowing Mr. Espinoza to work on days that Mr. Zwaschka

2    was not on duty.  (*See id.*)

3          Mr. Zwaschka further testified that circling furlough days was not Mr. Espinoza's

4    only option for attending to a military obligation on a day SPD scheduled him to work.

5    Mr. Espinoza could also use one of his 21 days of paid military leave, he could use

6    discretionary furlough time, or he could seek to take unpaid leave and rely solely on his

7    military salary for the unpaid leave dates.  (*See id.* at 23:6-25:2.)  Mr. Zwaschka echoed

8    Mr. Mahaffey's contention that, although he preferred that officers work on the days that

9    they are scheduled to work, he would have ensured that Mr. Espinoza received time off to

10   attend to his military obligations.  (*See id.* 25:3-18.)  Like Mr. Mahaffey, Mr. Zwaschka

11   testified that he did not know what USERRA was and did not speak to Mr. Espinoza

12   about USERRA.  (*See id.* at 20:19-21:2.)

13         6.    <u>Southwest Precinct Transfer Request</u>

14         Mr. Espinoza argues that SPD unfairly denied his request to transfer from the

15   West Precinct to the Southwest Precinct in July 2015.  (*See* Espinoza Decl. ¶ 27;

16   Espinoza Dep. at 127:18-25.)  Mr. Espinoza asserts that he submitted his transfer request

17   on the same day that another officer, Mike Sudduth, submitted a transfer request.  (*See*

18   Espinoza Decl. ¶ 27.)  According to Mr. Espinoza, SPD approved Mr. Sudduth's transfer

19   request and requests from a number of other officers, but denied Mr. Espinoza's request.

20   (*See id.*)  However, unbeknownst to Mr. Espinoza, the Assistant Chief of Patrol

21   Operations approved Mr. Espinoza's transfer request and included him on a list of

22   transfer candidates, but Mr. Espinoza was not transferred because the Southwest Precinct

wanted an officer for the third watch and Mr. Espinoza wanted to stay on the second watch.  (*See* 1st Seals Decl. ¶ 38, Ex. 37; Espinoza Dep. at 127:18-128:3.)

7.    Harassment Complaints

Mr. Espinoza declares that he complained to two of Mr. Mahaffey's superiors, Chris Fowler and Steve Wilske, about his belief that Mr. Mahaffey was harassing him on account of his status with the military reserves.  (*See* Espinoza Decl. ¶¶ 22-23, 28.) However, Mr. Espinoza's memorandum to Mr. Fowler requesting a transfer makes no mention of Mr. Espinoza's military status—even though Mr. Fowler was himself a member of the reserves at the time of Mr. Espinoza's request.  (*See* 1st Seals Decl. ¶ 53, Ex. 52; Espinoza Decl. ¶ 23.)  Further, although Mr. Espinoza alleges that he "understood" that Mr. Fowler told Mr. Mahaffey about Mr. Espinoza's complaint, which allegedly led Mr. Mahaffey to begin targeting him (*see* Espinoza Decl. ¶ 23), Mr. Espinoza admitted that he had no proof that Mr. Fowler relayed any information to Mr. Mahaffey about his complaint or his military status (*see* Espinoza Dep. at 120:7-121:13). Mr. Mahaffey testified that he never had any conversations with Mr. Fowler regarding Mr. Espinoza's military service or about discrimination against Mr. Espinoza on the basis of his military service.  (*See* Mahaffey Dep. at 96:1-14.)

Mr. Espinoza declares that he complained to Mr. Wilske about Mr. Mahaffey's discrimination against him on the basis of his reservist status in July 2015.  (*See* Espinoza Decl. ¶ 28.)  Mr. Wilske recalls that Mr. Espinoza complained that Mr. Mahaffey did not like him and would not approve his transfer request, but he testified that Mr. Espinoza did not speak to him about harassment.  (Wilske Dep. at 14:13-20.)  Mr. Mahaffey testified

1    that he never had any conversations with Mr. Wilske regarding Mr. Espinoza's military

2    service or about discrimination against Mr. Espinoza on the basis of his military service.

3    (*See* Mahaffey Dep. at 108:7-17.)

4        8.    Ride the Ducks Accident

5        Mr. Espinoza alleges that Mr. Mahaffey unfairly removed him from the scene of a

6    major traffic accident involving a "Ride the Ducks" vehicle on September 24, 2015,

7    which potentially cost him overtime hours.  (*See* Espinoza Decl. ¶ 29.)  Mr. Mahaffey

8    was the incident commander at the scene of that accident.  (*See* Mahaffey Decl. (Dkt.

9    # 77) ¶ 7.)  He asserts that several officers, including Mr. Espinoza, were released from

10   the scene to ensure that SPD properly allocated public safety resources across the West

11   Precinct.  (*See id.*)  Mr. Espinoza did not speak to Mr. Mahaffey that day and admitted he

12   does not know why he was released from the scene.  (*See* Espinoza Dep. at 210:4-211:4.)

13       9.    Captain Sackman's Case

14       Mr. Espinoza alleges that another case filed by a different SPD officer against

15   SPD regarding anti-military animus shows that SPD fosters a "corporate atmosphere of

16   discrimination" against members of the military.  (*See* MSJ Resp. at 3.)  SPD Captain

17   Gregory Sackman filed a lawsuit against SPD for military status discrimination in 2016.

18   (*See* Tymczyszyn Decl. ¶ 9, Ex. C ("Sackman Decl.") ¶ 4.)  Mr. Sackman's case settled

19   before trial.  (*See id.*)  Mr. Sackman contends that he knows Mr. Espinoza and that he

20   believes Mr. Espinoza's claims of anti-military reservist discrimination are consistent

21   with the culture he has experienced with the SPD.  (*See id.* ¶ 10.)  Mr. Sackman's

22   declaration does not provide any details on the depth of his relationship with Mr.

1   Espinoza or his knowledge of Mr. Espinoza's circumstances.  (*See generally id.*)  For

2   example, Mr. Sackman does not indicate whether he has ever worked directly with Mr.

3   Espinoza, whether he had the same supervisors as Mr. Espinoza, or whether Mr.

4   Espinoza and Mr. Sackman were assigned to the same precinct.  (*See generally id.*)

5       Mr. Espinoza relies heavily on one email chain about Mr. Sackman in support of

6   his argument that SPD discriminates against military reservists.  (*See* Tymczyszyn Decl.

7   ¶ 3, Ex. H.)  David Emerick and Lesley Cordner exchanged emails about Mr. Sackman's

8   request to attend community events on behalf of SPD.  (*See id.* at 1-3.)  In one email, Mr.

9   Emerick opined that "military guys" use the SPD to pad their military resumes while also

10  using the military to pad their SPD resumes and stated his belief that "[i]t is all about

11  them not us."  (*See id.* at 2.)  Ms. Cordner responded "Agreed" before changing the

12  subject.  (*See id.* at 1.)  Ms. Cordner and Mr. Emerick were assigned to the North Precinct

13  at the time Ms. Cordner sent this email.  (*See* 1st Seals Decl. ¶ 54, Ex. 53 ("Cordner

14  Dep.") at 23:2-12.)  As such, these officers were never in Mr. Espinoza's chain of

15  command.  (*See id.* ¶ 6, Ex. 5 at RFA Nos. 16-17.)

16  **C.    Mr. Espinoza's Disciplinary Record at SPD**

17      Mr. Espinoza and Defendants assert that Mr. Espinoza's disciplinary record at

18  SPD is relevant to this lawsuit, but for different reasons.  Defendants aver that Mr.

19  Espinoza's poor disciplinary record at SPD explains why SPD passed over Mr. Espinoza

20  for transfer to the Motorcycle Unit (*see, e.g.*, MSJ at 2 ("The undisputed evidence

21  demonstrates that [Mr. Espinoza's] own performance deficiencies and SPD's internal

22  staffing needs were the reasons [Mr. Espinoza's] alleged transfer requests were not

1    approved.")), while Mr. Espinoza contends that a number of SPD's disciplinary actions

2    against him were evidence of SPD's discriminatory animus against military reservists

3    (*see, e.g.*, MSJ Resp. at 18-20).

4        1.    Patronizing a Prostitute

5            On October 14, 2004, an officer with the Lakewood Police Department arrested

6    Mr. Espinoza for patronizing a prostitute.  (1st Seals Decl. ¶ 16, Ex. 15.)  As a result,

7    SPD placed him on administrative leave pending the completion of an investigation by

8    the Office of Professional Accountability ("OPA").  (*See id.* ¶ 17, Ex. 16.)  After

9    completion of the OPA investigation in December 2005, SPD imposed a 10-day unpaid

10   suspension based on sustained findings of misconduct and a violation of SPD Policy

11   1.029(III), which states police officers are expected to obey the law.  (*See id.* ¶¶ 18-19,

12   Exs. 17-18.)  Mr. Mahaffey alleges that this arrest and the damage it caused to Mr.

13   Espinoza's credibility contributed to the Narcotics Unit's decision not to select Mr.

14   Espinoza for the Narcotics Unit.  (*See* Mahaffey Dep. at 46:23-48:16.)

15       2.    Issues With the Public

16           Mr. Espinoza's interactions with the public have yielded a handful of disciplinary

17   actions against him.  On October 24, 2006, Plaintiff received a written reprimand for

18   failing to follow arrest procedures when he released a handcuffed suspect without

19   notifying his supervisor, in violation of SPD Policy 2.001.  (*See id.* ¶ 20, Ex. 19 at

20   SCL-Espinoza000298; *id.* ¶ 21, Ex. 20 at SCL-Espinoza008503.)  On August 14, 2016,

21   Plaintiff received a three-day unpaid suspension for failing to assist a woman who

22   claimed she was assaulted by a man who was still in the store where Mr. Espinoza

1    worked off-duty as a security officer.  (1st Seals Decl. ¶ 20, Ex. 19 at SCL-Espinoza

2    000291-92.)  Instead of assisting the alleged assault victim, Mr. Espinoza escorted her out

3    of the store, where she had to borrow a cell phone from a civilian to call 911.  (*See id.*)

4    OPA determined that the woman had been assaulted and Mr. Espinoza's actions allowed

5    her assailant to flee the scene.  (*See id.*)  OPA concluded that Mr. Espinoza violated SPD

6    policy and suspended Mr. Espinoza for three days without pay.  (*See id.*)

7            In 2016 and 2017, OPA referred Mr. Espinoza for additional training due to

8    complaints about his police conduct.  On December 31, 2016, OPA recommended that

9    Mr. Espinoza receive additional training on Terry stops and detentions following a

10   civilian complaint that Mr. Espinoza illegally detained him and behaved physically and

11   aggressively with him.  (*See id.* ¶ 47, Ex. 46.)  On January 28, 2017, OPA recommended

12   that Plaintiff receive additional training on listening to reporting parties and potential

13   victims and explaining enforcement actions after two security guards filed complaints

14   against Mr. Espinoza for failing to take enforcement action against an individual who

15   kicked and punched at the security guards.  (*See id.* ¶ 48, Ex. 47.)

16           3.    Tardiness Violations

17           In September 2014, Mr. Zwaschka coached Mr. Espinoza for his failure to abide

18   by SPD's policy requiring that officers remain on duty until their shift ends unless

19   excused by a supervisor.  (*See id.* ¶ 22, Ex. 21 at SCL-Espinoza077908; *id.* ¶ 31, Ex. 30;

20   *id.* ¶ 36, Ex. 35; Mahaffey Decl. ¶ 4.)  On September 22, 23, and 24, 2014, Mr. Zwaschka

21   and another sergeant observed Mr. Espinoza leaving work early without approval despite

22   being reminded repeatedly to stay in service and ready to respond to 911 calls until the

end of his shift.  (*See* 1st Seals Decl. ¶ 31, Ex. 30; *id.* ¶ 36, Ex. 35.)  SPD policy requires

supervisors to address officer tardiness.  (*See* Mahaffey Decl. ¶ 4.)  Accordingly, SPD

coached Mr. Espinoza and several other officers in Mr. Mahaffey's chain of command

for leaving work early in violation of SPD Policy in September 2014.  (*See id.*)

### 4.   In-Car Video Violations

Mr. Espinoza received a number of reprimands for failure to properly use his

in-car-video ("ICV") system in violation of SPD policy.  In October 2014, Mr. Zwaschka

coached Mr. Espinoza for failing to perform a function check on his in-car-video system

in violation of SPD Policy 16.090.  (*See* 1st Seals Decl. ¶ 31, Ex. 30; Espinoza Dep. at

125:20-126:5; 1st Seals Decl. ¶ 33, Ex. 32; *id.* at ¶ 36, Ex. 35.)  In March 2015, Mr.

Espinoza received a written reprimand for failing to use his ICV system to record his

interactions with a car prowl victim in violation of SPD Policy 16.090(4).  (*See id.* ¶ 20,

Ex. 19 at SCL-Espinoza000294-95.)  On May 31, 2015, SPD coached Mr. Espinoza for

failing to follow ICV procedures before leaving the precinct.  (*See* Espinoza Dep. at

144:3-18; 1st Seals Decl. ¶ 37, Ex. 36.)  In January 2016, while reviewing a use of force

investigation, Mr. Mahaffey was unable to hear the ICV audio because Mr. Espinoza did

not sync his microphone with his ICV as required by SPD Policy 16.090.  (*See* Mahaffey

Dep. at 112:1-15, 113:2-24, 114:5-115:22.)  Mr. Mahaffey reported Mr. Espinoza's

violation to OPA pursuant to SPD Policy 5.002(5)(6), which required reporting of ICV

violations.  (*See* 1st Seals Decl. ¶ 30, Ex. 29; *id.* ¶ 33, Ex. 32; Mahaffey Decl. ¶ 6.)  OPA

found that Plaintiff violated SPD Policy 16.090 and issued Mr. Espinoza a one-day

unpaid suspension.  (*See* 1st Seals Decl. ¶ 20, Ex. 19 at SCL-Espinoza000285-86.)

5.      Departure From Precinct Boundaries

In October 2014, Mr. Mahaffey reassigned Mr. Espinoza from the Queen Sector to the Mary Sector within the West Precinct after discovering that Mr. Espinoza had traveled outside the Queen Sector while on duty without authorization.  (*See id.* ¶ 36, Ex. 35.)  SPD Policy 5.100(I) requires patrol officers to "[r]emain in [their] area (district/beat) as much as possible."  (*See id.* ¶ 34, Ex. 33.)  On October 27, 2014, one of the sergeants under Mr. Mahaffey's command informed Mr. Mahaffey that he had received information from another officer that Mr. Espinoza was frequently not in Queen Sector and was rarely available to back up other officers.  (*See id.* ¶ 36, Ex. 35.)  The sergeant checked Mr. Espinoza's location the following day and determined that Mr. Espinoza was in the Ballard neighborhood, outside his assigned sector.  (*See id.*)  Mr. Espinoza alleges that he wound up in Ballard outside his sector after he followed a truck with an unsecured load across the Ballard Bridge.  (*See* Espinoza Decl. ¶ 18.)  Mr. Espinoza acknowledged that he did not return to his assigned precinct once he realized the load was secure but instead drove around Ballard for approximately 14 minutes to look for a "guy" who "hangs out" there because he wanted him to work on his motorcycle.  (*See id.*; Espinoza Dep. at 87:4-88:24.)

After Mr. Espinoza admitted to Mr. Mahaffey that he went to Ballard to visit a friend and that he was frequently in Ballard even though he was supposed to stay in his assigned area (*see id.* at 102:4-5, 102:6-20), Mr. Mahaffey reassigned Plaintiff to the Mary Sector, which covers the downtown Seattle area within the West Precinct.  (*See id.* at 128:4-9; Mahaffey Dep. at 65:7-14.)  Mr. Mahaffey asserts that he decided on the

1   reassignment in hopes that Mr. Espinoza would benefit from a more experienced sergeant

2   and being away from the temptation to leave his precinct.  (*See id.* at 121:5-122:8.)  Mr.

3   Espinoza asserts that he spoke to a sergeant in the Mary Sector immediately after his

4   meeting with Mr. Mahaffey and the sergeant informed Mr. Espinoza that he "already

5   knew" that SPD planned to transfer Mr. Espinoza.  (*See* Espinoza Decl. ¶ 20.)  This

6   conversation led Mr. Espinoza to conclude that his fate was "pre-determined" and his

7   meeting with Mr. Mahaffey was merely pretext to punish him for exercising his

8   USERRA rights.  (*See id.*)  Mr. Espinoza alleges that he has never heard of another

9   instance in which Mr. Mahaffey reassigned another officer without warning for leaving

10  the officer's sector without permission.  (*See id.* ¶ 21.)  Mr. Mahaffey states that he has

11  not reassigned another officer for leaving an assigned sector without permission because

12  he is not aware of any other officer in his chain of command who frequently left their

13  assigned sector without authorization.  (*See* Mahaffey Decl. ¶ 5.)

14      6.    <u>Failure to Provide Backup</u>

15      On May 31, 2015, Mr. Espinoza received coaching for failing to respond to an

16  in-progress fight when he was only one block away from the arrest scene, and failing to

17  respond to a call for back up to an in-progress disturbance with a knife.  (*See* 1st Seals

18  Decl. ¶ 37, Ex. 36.)  As a result of Mr. Espinoza's failure to respond to the back-up call

19  for the knife incident, the lieutenant involved with the call asked that Mr. Espinoza not be

20  assigned as a backfill officer.  (*See id.*)

21  //

22  //

ORDER - 23

**D.    Procedural History**

Mr. Espinoza filed his tort claim with the City of Seattle on September 13, 2017, (*see id.* ¶ 55, Ex. 54), and filed this action on November 13, 2017 (*see* Compl. (Dkt. # 1) at 16).  Mr. Espinoza alleges six claims against Defendants:  (1) discrimination in violation of the Washington Law Against Discrimination ("WLAD"), RCW ch. 46.90; (2) discrimination in violation of 38 U.S.C. § 4311 of USERRA; (3) retaliation in violation of 38 U.S.C. § 4311 of USERRA; (4) denial of seniority benefits in violation of 38 U.S.C. § 4316 of USERRA; (5) failure to contribute to a pension plan in violation of 38 U.S.C. § 4318 of USERRA; and (6) willful violation of USERRA in violation of 38 U.S.C. § 4323.  (*See* Am. Compl. (Dkt. # 32) at 14-16.)

## III.    ANALYSIS

Defendants move for summary judgment on all of Mr. Espinoza's claims (*see* MSJ at 1-2) and move to exclude Mr. Espinoza's damages expert, Mr. West (*see* MTE at 1-2). The court first details the applicable legal standards for Defendants' motions before turning to the merits of the parties' arguments.[8]

---

[8] In their reply brief in support of their motion for summary judgment, Defendants also move to strike (1) Mr. Sackman's declaration and the exhibits attached to that declaration, and (2) portions of Mr. Espinoza's declaration.  (*See* MSJ Reply (Dkt. # 85) at 2-4.)  Mr. Espinoza filed a surreply in opposition to Defendants' motion to strike.  (*See* Surreply (Dkt. # 87).)  As noted below, the court disregards Mr. Sackman's declaration and the complaint and settlement agreement from his case against SPD because those documents are either not relevant to Mr. Espinoza's discrimination claim or based on Mr. Sackman's lack of personal knowledge about Mr. Espinoza's circumstances.  *See infra* § III.B.1.b.iii.  Similarly, although the court agrees with Defendants that portions of Mr. Espinoza's declaration are improper or inadmissible, the court is capable of merely disregarding those portions of the declaration.  *See, e.g.*, *Tighe v. King Cty.*, Case No. 17-1875BAT, 2019 WL 117998, at *5 (W.D. Wash. Jan. 7, 2019) (rejecting motion to strike improper declaration testimony on the grounds that the court was capable of rejecting

1  **A.    Legal Standard**

2         Summary judgment is appropriate if the evidence shows "that there is no genuine

3  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

4  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

5  *Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

6  outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

7  factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

8  finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

9  992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

10        The moving party bears the initial burden of showing there is no genuine dispute

11 of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

12 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

13 show the absence of such a dispute in two ways:  (1) by producing evidence negating an

14 essential element of the nonmoving party's case, or (2) by showing that the nonmoving

15 party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

16 *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

17 meets its burden of production, the burden then shifts to the nonmoving party to identify

18 specific facts from which a factfinder could reasonably find in the nonmoving party's

19 favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

20

21 _____

improper testimony rather than striking the declaration).  Thus, the court DENIES as moot
22 Defendants' motion to strike.

1        The court is "required to view the facts and draw reasonable inferences in the light

2  most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007)

3  (internal quotation marks and citation omitted).  The court may not weigh evidence or

4  make credibility determinations in analyzing a motion for summary judgment because

5  those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  However,

6  the nonmoving party "must do more than simply show that there is some metaphysical

7  doubt as to the material facts . . . .  Where the record taken as a whole could not lead a

8  rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

9  *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec.*

10  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

11  **B.    Defendants' Summary Judgment Motion**

12        1.    <u>Mr. Espinoza's USERRA Discrimination and Retaliation Claims</u>

13        "USERRA forbids employment discrimination on the basis of membership in the

14  armed forces." *Townsend v. Univ. of Alaska*, 543 F.3d 478, 482 (9th Cir. 2008) (citing 38

15  U.S.C. §§ 4301(a)(3), 4311(a)).  USERRA recognizes claims for discrimination and

16  retaliation.  *See Huhmann v. Fed. Express Corp.*, 874 F.3d 1102, 1105 (9th Cir. 2017)

17  (outlining standard for USERRA discrimination claims); *Wallace v. City of San Diego*,

18  479 F.3d 616, 624-25 n.1 (9th Cir. 2007) (outlining standard for USERRA retaliation

19  claims).  The first step in a USERRA discrimination or retaliation claim requires courts to

20  determine whether the employee suffered an adverse employment action.  *See Posin v.*

21  *Cty. of Orange*, No. SACV150120AGJCGX, 2016 WL 5858706, at *3 (C.D. Cal. Jan.

22  18, 2016).  If the employee suffered an adverse employment action, then a claim of

1   discrimination under USERRA proceeds under a burden-shifting approach where the

2   employee "first has the burden of showing, by a preponderance of the evidence, that his

3   or her protected status was a substantial or motivating factor in the adverse employment

4   action; the employer may then avoid liability only by showing, as an affirmative defense,

5   that the employer would have taken the same action without regard to the employee's

6   protected status." *Huhmann*, 874 F.3d at 1105 (quoting *Wallace*, 479 F.3d 624).

7   Although a retaliation claim requires an additional threshold showing that the employee

8   exercised his or her USERRA rights, *see Wallace*, 479 F.3d at 624, the burden-shifting

9   framework for discrimination and retaliation claims under USERRA is identical,

10   *compare Wallace*, 479 F.3d at 624 *with Huhmann*, 874 F.3d at 1105.

11              a.      *Adverse Employment Action*

12        Although Mr. Espinoza's complaint and declaration in this action include a

13   laundry list of Defendants' alleged bad acts and anti-military animus (*see generally* Am.

14   Compl.; Espinoza Decl.), his response to Defendants' summary judgment motion

15   unequivocally states that his discrimination and retaliation claims are based on SPD's

16   delay in transferring him to the Motorcycle Unit.  (*See* MSJ Resp. at 16 ("Mr. Espinoza's

17   USERRA and WLAD discrimination and retaliation claims are founded on Defendants'

18   failure to promote him to the motorcycle squad."[9]).)  Thus, the court first addresses

19   //

20

21        [9] Although Mr. Espinoza repeatedly labels SPD's actions as a "failure" to transfer him to
     the Motorcycle Unit, it is undisputed that SPD eventually transferred Mr. Espinoza to the unit in
     2018.  (Espinoza Decl. ¶ 40.)  Thus, the court refers to the SPD's actions as a "delay" in
22   transferring Mr. Espinoza to the Motorcycle Unit.

1  whether SPD's delay in transferring Mr. Espinoza to the Motorcycle Unit constitutes an

2  adverse employment action under USERRA.

3         Although the Ninth Circuit has yet to weigh in on this issue, a number of other

4  courts have concluded that a USERRA plaintiff must establish he or she suffered a

5  "materially adverse" employment action to sustain a discrimination or retaliation claim

6  under USERRA.  *See, e.g.*, *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019)

7  ("In protecting employees from 'any adverse employment action,' . . . USERRA does not

8  'provide a remedy for trivial harms.'  Rather, the employment action must be materially

9  adverse to be actionable under the statute.") (quoting 38 U.S.C. § 4311(b) & *Lisdahl v.*

10 *Mayo Found.*, 633 F.3d 712, 721 (8th Cir. 2011)); *Crews v. City of Mt. Vernon*, 567 F.3d

11 860, 869 (7th Cir. 2009) (reviewing the materiality requirement in Title VII retaliation

12 actions and holding that "[t]here is no reason to understand 'adverse employment action'

13 differently in the USERRA context"); *Posin*, 2016 WL 5858706, at *3 (C.D. Cal. Jan. 18,

14 2016); *Maya v. Leprino Foods Co.*, No. 1:12-CV-1479 AWI GSA, 2014 WL 1091251, at

15 *21 (E.D. Cal. Mar. 18, 2014).  "A materially adverse action is one that 'significantly

16 alters the terms and conditions of an employee's job,' such as 'termination, demotion

17 accompanied by a decrease in pay, or a material loss of benefits or responsibilities.'"

18 *Spann v. City of Los Angeles*, No. CV141751ABCAGRX, 2014 WL 12703994, at *3

19 (C.D. Cal. Apr. 3, 2014) (quoting *Crews*, 567 F.3d at 869).

20        Mr. Espinoza labels SPD's delay in transferring him to the Motorcycle Unit as a

21 "materially adverse action" because a transfer would have yielded an increase in his

22 compensation.  (*See* MSJ Resp. at 16.)  But Mr. Espinoza's proposed damages expert,

Eric West, opines that Mr. Espinoza's hourly wage would have decreased upon transfer to the Motorcycle Unit. (*See* Lee Decl. (Dkt. 74) ¶ 6, Ex. 5 ("1/3/19 West Rpt.") at 3.) Mr. West's conclusion that Mr. Espinoza would have earned additional compensation upon transfer to the Motorcycle Unit rests entirely on the assumption that Mr. Espinoza would have worked an additional 70 to 76 hours of overtime per month upon transfer to the Motorcycle Unit. (*See id.* at 1-4.) Although Defendants allege that a transfer to the Motorcycle Unit was merely a different lateral "assignment" to a different unit—not a "promotion"—that would not have impacted Mr. Espinoza's position or rank (*see* MSJ Reply at 9 n.1), Defendants do not dispute that SPD's delayed transfer to the Motorcycle Unit qualifies as a material adverse employment action under USERRA (*see generally* MSJ; MSJ Reply).

Because Defendants do not respond to Mr. Espinoza's argument that SPD's delay in transferring him to the Motorcycle Unit is a materially adverse employment action under USERRA, the court concludes that Mr. Espinoza has provided sufficient evidence to establish a genuine dispute of material fact on this threshold requirement.

### b.   *Motivating Factor*

To establish a discrimination or retaliation claim under USERRA, a plaintiff must first establish that the plaintiff's military status was a "motivating factor" behind the adverse employment action. 38 U.S.C. § 4311(c)(1)-(2); *see also Huhmann*, 874 F.3d at 1105 (quoting *Wallace*, 479 F.3d 624). "Under USERRA, military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Campbell v. Catholic Cmty. Servs. of W. Wash.* No.

1  C10-1579-JCC, 2012 WL 13020051, at *2 (W.D. Wash. Aug. 1, 2012) (citations and

2  internal quotations omitted).  The Ninth Circuit instructs that courts may consider a

3  "variety of factors" in determining whether an employer had discriminatory motivation,

4  including:

> proximity in time between the employee's military activity and the adverse
> employment action, inconsistencies between the proffered reason and other
> actions of the employer, an employer's expressed hostility towards members
> protected by the statute together with knowledge of the employee's military
> activity, and disparate treatment of certain employees compared to other
> employees with similar work records or offenses.

*See Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002) (citations omitted).

Mr. Espinoza alleges that the court may infer that Defendants acted with

anti-military animus for the following reasons:  (1) the proximity in time between the

incident where Mr. Espinoza asserts he "challenged" Mr. Mahaffey on circling furlough

dates by showing him a copy of USERRA and Mr. Mahaffey's decision to "discipline

Mr. Espinoza and block Mr. Espinoza's transfer requests"; (2) the "inconsistencies"

presented by SPD's decision to allow Mr. Espinoza to take the Motorcycle Unit training

and then delay his transfer to the unit; (3) the "corporate atmosphere of discrimination" at

SPD; (4) Defendants' dissimilar treatment of the "similarly situated" individuals in his

Motorcycle Unit; (5) SPD's other violations of USERRA, including SPD's alleged

failures to provide Mr. Espinoza with service credits and its requirement that Mr.

Espinoza obtain pre-approval for military leave; and (6) "[r]elated anti-military animus"

including Mr. Espinoza's decision to "stand[] up" to Mr. Mahaffey and "others

expressing frustration with [Mr.] Espinoza's military service."  (*See* MSJ Resp. at 18-19.)

1   The court addresses each of these alleged sources of evidence of discriminatory motive in

2   turn.

3                              i.      Proximity in Time

4           There are at least three problems with Mr. Espinoza's argument that the court can

5   infer discriminatory motivation on Defendants' behalf based on the proximity in time

6   between Mr. Espinoza allegedly "challenging" Mr. Mahaffey with a copy of USERRA

7   and Defendants' delay in transferring Mr. Espinoza to the Motorcycle Unit.[10]  First, Mr.

8   Espinoza asserts that he filed applications for the Motorcycle Unit in 2012 and in August

9   2014, but the alleged "challenge" to Mr. Mahaffey did not occur until after "the

10  September 2014 timeframe" when SPD assigned Mr. Zwaschka as Mr. Espinoza's new

11  supervisor.[11]  (*See* Espinoza Decl. ¶¶ 11-16.)  The fact that the relevant adverse

---

[10] The court recognizes that Mr. Mahaffey and Mr. Zwaschka dispute Mr. Espinoza's allegation that Mr. Espinoza raised concerns about military discrimination and showed them a copy of USERRA.  (*See* Zwaschka Dep. at 20:19-21:2; Mahaffey Dep. at 67:8-68:14.)  For purposes of summary judgment, however, the court must weigh the available evidence in the light most favorable to Mr. Espinoza.  *See Scott*, 550 U.S. at 378.  Thus, solely for purposes of this summary judgment motion, the court credits Mr. Espinoza's assertion that he raised complaints with Mr. Mahaffey and Mr. Zwaschka.

[11] Although the court notes that there is scant documentary evidence corroborating Mr. Espinoza's assertions that he applied to transfer to the Motorcycle Unit in 2012 and 2014, the court must weigh the evidence in the light most favorable to Mr. Espinoza.  *See Scott*, 550 U.S. at 378.  The testimony in the record establishes only that an SPD lieutenant in the Motorcycle Unit was unaware that Mr. Espinoza had submitted a transfer application in 2012 and that Mr. Mahaffey had no knowledge of 2014 transfer requests from Mr. Espinoza.  (*See* Espinoza Dep. at 63:14-64:12; Mahaffey Dep. at 66:3-20.)  That testimony does not definitively rebut Mr. Espinoza's allegations that he submitted applications to transfer to the Motorcycle Unit in 2012 and 2014.  (*See* Espinoza Decl. ¶¶ 11-12.)  Thus, for purposes of this summary judgment motion, the court credits Mr. Espinoza's testimony that he applied to transfer to the Motorcycle Unit in 2012 and 2014.

1   employment actions began occurring before Mr. Espinoza challenged Mr. Mahaffey

2   significantly undermines Mr. Espinoza's temporal proximity argument.  *See Francis v.*

3   *Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (affirming the trial

4   court's decision to grant summary judgment on a USERRA claim because plaintiff's

5   temporal proximity argument failed to account for the fact that adverse employment

6   actions began before military activity); *Slattery v. Swiss Reinsurance Am. Corp.*, 248

7   F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and

8   gradual adverse job actions began well before the plaintiff had ever engaged in any

9   protected activity, an inference of retaliation does not arise.").

10        Second, Mr. Espinoza hinges his discrimination claims on Mr. Mahaffey's alleged

11   anti-military bias (*see* Espinoza Dep. at 212:18-25), but Mr. Espinoza has failed to show

12   that Mr. Mahaffey had any control over his application to transfer to the Motorcycle

13   Unit.[12]  *See Tridico v. D.C.*, 130 F. Supp. 3d 17, 26 (D.D.C. 2015) (granting a summary

14   judgment motion in a USERRA case because "there [was] no evidence that the

15   individuals who made the decision to transfer [the] plaintiff had any contact with [the

16   supervisor the plaintiff alleged harbored anti-military animus] before transferring the

17   plaintiff).  Multiple SPD witnesses testified that approval of transfer requests from one

18   bureau to another—such as a transfer from Patrol Operations to Special Operations—had

19

20        [12] Although the court accepts Mr. Espinoza's allegation that he applied for transfers to the
     Motorcycle Unit, Mr. Espinoza cannot identify any evidence showing that Mr. Mahaffey

21   received or denied his transfer requests in 2014, and Mr. Espinoza does not rebut Mr. Mahaffey's
     testimony that Mr. Mahaffey had no knowledge of Mr. Espinoza's 2014 transfer requests.  (*See*
     Mahaffey Dep. at 66:3-20.)  Thus, the undisputed evidence shows that Mr. Mahaffey was not

22   aware that Mr. Espinoza wanted to transfer to the Motorcycle Unit in 2014.

1  to be approved by the Assistant Chiefs of both bureaus.  (*See* Mahaffey Dep. at 66:13-20

2  ("I never received a request for [Mr. Espinoza] to go to the Motorcycle Unit.  And as I

3  stated before, the process that we use for transfer, I would not have had that authority to

4  deny any of his transfer requests."); *see also id.* at 60:13-61:4; Wilske Dep. at 24:8-24;

5  Espinoza Dep. at 64:13-65:5.)  Mr. Espinoza offers no evidence that the Assistant Chiefs

6  of Patrol Operations and Special Operations acted with anti-military animus when they

7  failed to select him for transfer to the Motorcycle Unit prior to 2018.  (*See generally* MSJ

8  Resp.; Espinoza Decl.)  In fact, Mr. Espinoza testified that he does not believe that the

9  Assistant Chief of Patrol Operations at the time of Mr. Espinoza's transfer requests, Mr.

10  Wilske, harbored animosity toward USMCR members.  (*See* Espinoza Dep. at 146:1-5.)

11       Finally, even if Mr. Mahaffey could have influenced the results of Mr. Espinoza's

12  transfer requests, Mr. Espinoza submits no evidence that Mr. Mahaffey harbored

13  anti-military animus.  An employer may be liable for discrimination under USERRA "if a

14  supervisor performs an act motivated by antimilitary animus that is intended by the

15  supervisor to cause an adverse employment action, and if that act is a proximate cause of

16  the ultimate employment action."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

17  Although the parties appear to agree that Mr. Mahaffey discussed Mr. Espinoza's

18  performance history with a lieutenant in the Motorcycle Unit—Mr. Kuehn—in 2015 (*see*

19  Mahaffey Dep. at 101:5-24; Espinoza Decl. ¶ 26), Mr. Espinoza submits no evidence that

20  Mr. Mahaffey's informal performance review or any of his other actions had any causal

21  impact on the Motorcycle Unit's decision to select another officer for transfer to the unit

22  in 2015.  *See Durant v. MillerCoors, LLC*, 415 F. App'x. 927, 930-31 (10th Cir. 2011)

1   (granting summary judgment to the defendant when the plaintiff offered no evidence to

2   establish that his employer was influenced by another supervisor's alleged "antimilitary

3   animus" in firing the plaintiff).

4         But even if the court were to infer that Mr. Mahaffey proximately caused Mr.

5   Espinoza's delayed transfer, Mr. Espinoza still fails to show that Mr. Mahaffey's actions

6   were motivated by anti-military animus.  Mr. Espinoza attempts to support his allegation

7   that Mr. Mahaffey harbored anti-military animus based on his perception of Mr.

8   Mahaffey's reaction to Mr. Espinoza showing him a copy of USERRA.  Specifically, Mr.

9   Espinoza alleges that he "could tell" that Mr. Mahaffey "was not pleased with [Mr.

10  Espinoza] at that moment" that Mr. Espinoza showed Mr. Mahaffey a copy of USERRA.

11  (*See* Espinoza Decl. at ¶ 16.)  But Mr. Espinoza's subjective guess about Mr. Mahaffey's

12  state of mind is speculative and inadmissible.  *See, e.g.*, *United States v. Kupau*, 781 F.2d

13  740, 745 (9th Cir. 1986) ("Since Chang's opinion of Kupau's state of mind would have

14  constituted speculation, the judge did not plainly err in excluding it.").  Mr. Espinoza

15  cannot identify a single comment, document, or objective action from Mr. Mahaffey that

16  suggests that Mr. Mahaffey harbored anti-military animus.  (*See generally* MSJ Resp.)

17  Moreover, Mr. Espinoza asserts that the impetus for his decision to challenge Mr.

18  Mahaffey with a copy of USERRA was to ensure that he was entitled to take leave for his

19  military service (*see* Espinoza Decl. ¶¶ 16-17), but Mr. Espinoza does not point to a

20  single instance in which Mr. Mahaffey or SPD denied a request for leave to perform

21  military service (*see generally id.*; MSJ Resp.).

22  *//*

1      Mr. Espinoza also points to the fact that Mr. Mahaffey disciplined Mr. Espinoza

2   for a number of violations of SPD policy after Mr. Espinoza "challenged" Mr. Mahaffey

3   with USERRA as circumstantial evidence of Mr. Mahaffey's anti-military animus.  (*See*

4   MSJ Resp. at 18.)  The first issue with this argument is that it is a red-herring.  SPD's

5   disciplinary actions against Mr. Espinoza are not the adverse employment actions at issue

6   in this case.  (*See id.* at 16.)  Instead, SPD's delay in transferring Mr. Espinoza to the

7   Motorcycle Unit is the adverse employment action at issue (*see id.*), meaning the relevant

8   question is whether the court may infer anti-military animus based on the timing of Mr.

9   Espinoza's "military activity"—challenging Mr. Mahaffey—and SPD's decisions to

10   delay his transfer to the Motorcycle Unit.  *See Leisek*, 278 F.3d at 900 (listing "proximity

11   in time between the employee's military activity and the adverse employment action" as

12   a factor courts may consider in inferring discriminatory intent under USERRA).  Mr.

13   Espinoza's disciplinary actions are relevant to his USERRA claim only insofar as those

14   actions show that Mr. Mahaffey exhibited anti-military animus against Mr. Espinoza that

15   proximately caused his delayed transfer to the Motorcycle Unit.  *See Staub*, 562 U.S. at

16   422.

17      The disciplinary violations do not establish that Mr. Mahaffey exhibited anti-

18   military animus for a number of reasons.  First, Mr. Mahaffey was only responsible for

19   one of Mr. Espinoza's disciplinary actions around the time that Mr. Espinoza challenged

20   Mr. Mahaffey with a copy of USERRA—the decision to transfer Mr. Espinoza in

21   October 2014 for leaving his assigned sector without approval.  (*See* Espinoza Decl.

22   ¶¶ 19-20; Mahaffey Decl. ¶ 5.)  Mr. Zwaschka, not Mr. Mahaffey, documented Mr.

1   Espinoza's violations for leaving watch early and improperly operating his ICV and

2   coached Mr. Espinoza for those violations.  (*See* 1st Seals Decl. ¶ 31, Ex. 30; *id.* ¶ 36, Ex.

3   35; Mahaffey Decl. ¶ 4.)  Mr. Zwaschka was Mr. Espinoza's acting sergeant for no more

4   than two months.  (*See* Zwaschka Dep. at 15:4-7 (noting that Mr. Zwaschka was assigned

5   to supervise Mr. Espinoza in September 2014); 1st Seals Decl. ¶ 36, Ex. 35 (noting that

6   Mr. Mahaffey transferred Mr. Espinoza to Mary Sector and assigned him a new

7   supervisor in October 2014).)  Thus, Mr. Zwaschka is even further removed from the

8   Motorcycle Unit's decisions to delay Mr. Espinoza's transfer than Mr. Mahaffey.  Indeed,

9   Mr. Espinoza does not allege that Mr. Zwaschka had any impact on the Motorcycle

10   Unit's decision on his transfer requests.  (*See generally* MSJ Resp.)  Moreover, Mr.

11   Espinoza testified that he does not believe that Mr. Zwaschka, who served in the military

12   for 24 years (*see* Zwaschka Dep. at 15:13-17), harbored animosity toward members of

13   the military reserves (*see* Espinoza Dep. at 72:7-24).

14        Mr. Espinoza also does not dispute the legitimacy of the disciplinary actions taken

15   against him in 2014—near the time he challenged Mr. Mahaffey—for failing to properly

16   use his ICV, leaving work early, or leaving his assigned sector without approval.  (*See*

17   *generally* MSJ Resp.; Espinoza Dep. at 98:13-25, 123:1-127:7.)  Defendants submitted

18   evidence showing that Mr. Espinoza did, in fact, violate SPD policy, and Mr. Espinoza

19   does not rebut that evidence.  (*See* Mahaffey Decl. ¶¶ 3-6 (detailing the SPD policies that

20   Mr. Espinoza violated); 1st Seals Decl. ¶ 36, Ex. 35; *id.* ¶ 22, Ex. 21 at SCL-

21   Espinoza077908 (requiring that patrol officers remain on duty for entire watch period);

22   *id.* ¶ 33, Ex. 32 at SCL-Espinoza078346-49 (setting for SPD policy for ICV use); *id.*

¶ 34, Ex. 33 at SCL-Espinoza075413 (requiring patrol officers to remain in their assigned district or beat).)  Mr. Espinoza also has no evidence that Mr. Mahaffey disciplined him more harshly than other non-reservist SPD officers.  (*See generally* MSJ Resp.; Espinoza Decl.)  Mr. Espinoza underscores Mr. Mahaffey's admission that he has never transferred another officer for leaving his sector without authorization as evidence of Mr. Mahaffey's anti-military animus (*see* MSJ Resp. at 12-13), but Mr. Espinoza has no evidence to dispute Mr. Mahaffey's testimony that he has never supervised another officer who has left his or her assigned precinct without authorization (*see* Mahaffey Decl. ¶ 5).  Absent some non-conclusory evidence showing that Mr. Mahaffey harbored anti-military motivations, the fact that Mr. Espinoza repeatedly violated SPD policy and was disciplined by multiple superiors for those violations near the time that he challenged Mr. Mahaffey is nothing more than a coincidence.

In sum, the court rejects Mr. Espinoza's argument that the court may infer that Defendants delayed his transfer to the Motorcycle Unit based on proximity in time between Mr. Espinoza "challenging" Mr. Mahaffey and SPD's decisions to delay Mr. Espinoza's transfer requests.  The alleged adverse employment actions that Mr. Espinoza bases his claims on—SPD's delayed decision to transfer him to the Motorcycle Unit— began before Mr. Espinoza challenged Mr. Mahaffey; Mr. Espinoza bases his claims of discrimination on Mr. Mahaffey's alleged anti-military animus, but the undisputed evidence shows that Mr. Mahaffey had no authority or control over Mr. Espinoza's requests to transfer to a different operations bureau; and even if Mr. Espinoza could show that Mr. Mahaffey impacted his transfer requests, he has failed to provide any evidence

1    beyond speculation, coincidence, and his own beliefs in support of his allegation that Mr.

2    Mahaffey exhibits anti-military bias against him.  This is insufficient to create a genuine

3    dispute of material fact on the question of whether Defendants' anti-military bias was a

4    motivating factor in Mr. Espinoza's delayed transfer to the Motorcycle Unit.  *See Caines*

5    *v. City of New York*, No. 13-CV-676 (VEC), 2015 WL 13021892, at *7 (S.D.N.Y. July 8,

6    2015), *aff'd*, 649 F. App'x 74 (2d Cir. 2016) ("[W]hile Plaintiff asserts that he believes a

7    number of adverse actions occurred because of his military service . . . , his arguments

8    linking those complaints to the change of his shift, his poor performance evaluation, his

9    transfer to the 110th Precinct, and the penalty for his 2007 Charges are purely

10   speculative.  Although he may believe that those things happened because of his military

11   service . . . , he points to no evidence to support that belief, and there is substantial

12   evidence in the record that undermines the reasonableness of his belief.").

13                      ii.    SPD's "Inconsistent" Explanations

14          Mr. Espinoza argues that Defendants' explanations for why Mr. Espinoza was not

15   promoted to the Motorcycle Unit are inconsistent with Defendants' other actions, which

16   should be construed as evidence of military animus.  (*See* MSJ Resp. at 18); *see also*

17   *Leisek*, 278 F.3d at 900 (listing "inconsistencies between the proffered reason and other

18   actions of the employer" as one of the grounds courts may consider in determining

19   whether an employer acted with discriminatory intent).  Specifically, Mr. Espinoza notes

20   that SPD allowed him to attend the Motorcycle Unit training in 2012 and apply for

21   transfers to the Motorcycle Unit, but never informed him that his delayed transfer to the

22   Motorcycle Unit was due to disciplinary issues until he filed this lawsuit.  (*See* MSJ

1    Resp. at 9 ("Mr. Espinoza declares that the first time he ever heard SPD's supposed

2    reasoning for not promoting him to the motorcycle squad was after he filed this

3    lawsuit.").)  He also alleges that the fact that SPD eventually transferred him to the

4    Motorcycle Unit after this lawsuit is inconsistent with SPD's assertion that his

5    disciplinary record prevented him from qualifying for the Motorcycle Unit.  (*See id.* at

6    1-2.)

7         There are a litany of issues with Mr. Espinoza's argument that SPD treated him

8    inconsistently.  First, there is no evidence that SPD acted inconsistently by allowing Mr.

9    Espinoza to take the Motorcycle Unit training course but then delaying his transfer due to

10   disciplinary issues.  Special Operations maintains specific policies that detail the

11   selection criteria for transfer to Traffic Section and to the Motorcycle Unit.  (*See* 1st Seals

12   Decl. ¶ 25, Ex. 24 at SCL-Espinoza001499; *id.* ¶ 26, Ex. 25.)  An applicant's work record

13   and disciplinary record are listed amongst the criteria that the Motorcycle Unit considers

14   when assessing applicants.  (*See id.*)

15        Mr. Espinoza testified that SPD applied those criteria prior to selecting officers

16   for Motorcycle Unit training, which meant that he was essentially pre-qualified for

17   assignment to the Motorcycle Unit.  (*See* Espinoza Dep at 60:18-61:6.)  However, Mr.

18   Espinoza does not point to any evidence in the record showing that the Motorcycle Unit

19   considered the selection criteria prior to selecting him for training in 2012, and he does

20   not show that the Motorcycle Unit disregards the selection criteria once an officer

21   completes the training.  (*See generally* MSJ Resp.)  In fact, the specific language in the

22   policies and the available documentary evidence confirms that completion of the training

ORDER - 39

1    course is only one of many criteria that the Motorcycle Unit considers when selecting an

2    officer for transfer into the unit.  (*See* 1st Seals Decl. ¶ 25, Ex. 24 at

3    SCL-Espinoza001499 (noting that "assignment" into the Traffic Section will be

4    determined by a number of criteria); *id.* at SCL-Espinoza001500 ("Upon successful

5    completion of this two-week course of instruction, student riders are placed on an

6    eligibility list for consideration for future assignment to a motorcycle squad."); *id.* at

7    SCL-Espinoza001502 ("Successful completion of the [training course] does not

8    guarantee an assignment with the Motorcycle Unit, and other factors such as attitude,

9    compatibility with others, and the ability to ride safely will be considered."); *id.* ¶ 26, Ex.

10   25 (stating that completion of the Motorcycle Unit training course is one of 15 criteria

11   that the Motorcycle Unit considers for "[a]ssignment into the Motorcycle Unit"); *id.* ¶ 39,

12   Ex. 38 (SPD posting for availability in the Motorcycle Unit noting that "[s]uccessful

13   completion of the motorcycle operators course does not guarantee a candidate's selection

14   into the unit"); *id.* ¶ 43, Ex. 42 (email from Traffic Section Commander listing "working

15   events," "continuous training, and "recent OPA findings" as factors considered in ranking

16   candidates for transfer to Motorcycle Unit); *id.* ¶ 46, Ex. 45 (email listing frequency of

17   volunteer work, job performance during volunteer work, "[t]ardiness," and attitude

18   concerns as factors considered in ranking candidates for transfer to the Motorcycle Unit).

19   Thus, Mr. Espinoza's allegation that he essentially pre-qualified for assignment to the

20   Motorcycle Unit by passing the training course is directly contradicted by the evidence in

21   the record showing that the Motorcycle Unit considers a host of factors before selecting

22   applicants for the unit.

1    Moreover, Mr. Espinoza ignores all of the disciplinary incidents that occurred

2    after he completed the Motorcycle Unit training course in 2012.  The only relevant

3    disciplinary incidents in Mr. Espinoza's record prior to taking the training course were

4    his 2004 arrest for patronizing a prostitute and the 2006 reprimand he received for failing

5    to follow arrest protocols.  *See supra* §§ II.C.1-2.  After Mr. Espinoza took the training

6    course, SPD disciplined him for failing to assist an assault victim, failing to conduct

7    proper Terry stops and detentions, failing to properly explain enforcement actions,

8    leaving duty early without being excused, a multitude of ICV violations, leaving his

9    assigned precinct without authorization, and failing to provide adequate backup.  *See*

10   *supra* §§ II.C.2-6.  Thus, even if Mr. Espinoza submitted evidence that SPD's decision to

11   allow Mr. Espinoza meant that the Motorcycle Unit had signed off on his pre-training

12   discipline record—which he does not—Mr. Espinoza fails to explain why the Motorcycle

13   Unit was not entitled to consider his post-training discipline record.[13]

14   Mr. Espinoza's allegation that SPD failed to inform him why he was not selected

15   for the Motorcycle Unit until he filed this lawsuit also does not create any

16   "inconsistencies" sufficient to create a genuine dispute of material fact that Defendants

17   acted with anti-military animus.  The first issue with this argument is that there is no

18   record of Mr. Espinoza's applications for transfer to the Motorcycle Unit in 2012 and

19

20

21

22

---

[13] Indeed, in 2016, when the Motorcycle Unit ranked Mr. Espinoza ninth on the list of applicants for the Motorcycle Unit, the officer who compiled the ranking noted that there were "some concerns" about Mr. Espinoza due to "recent OPA findings," suggesting that the Motorcycle Unit was more concerned with Mr. Espinoza's post-training record than his pre-training record.  (*See* 1st Seals Decl. ¶ 44, Ex. 43 at SCL-Espinoza001213-14.)

1   2014 beyond Mr. Espinoza's own assertions that he applied.  (*See* Espinoza Decl.

2   ¶¶ 11-12, 24.)  Mr. Espinoza concedes that a lieutenant in the Motorcycle Unit informed

3   him in 2014 that SPD had no record of his 2012 transfer request (*see* Espinoza Dep. at

4   63:14-64:12), Mr. Mahaffey asserts he never received a transfer request from Mr.

5   Espinoza in 2014 when he was Mr. Espinoza's supervisor (*see* Mahaffey Dep. at

6   66:3-20), and neither party produces the transfer memoranda that Mr. Espinoza alleges he

7   submitted (*see generally* MSJ; MSJ Resp.)  Although SPD cannot definitively rebut Mr.

8   Espinoza's testimony that he submitted transfer requests in 2012 and 2014, Mr.

9   Espinoza's failure to produce any record of SPD's decision-making process on Mr.

10  Espinoza's transfer requests prevents the court from determining whether SPD's alleged

11  denials of Mr. Espinoza's transfer requests in 2012 and 2014 were inconsistent with the

12  positions Defendants take in this lawsuit.

13          Mr. Espinoza's argument that Defendants never informed him why he was not

14  transferred to the Motorcycle Unit is also directly contradicted by Mr. Espinoza's own

15  declaration.  Mr. Espinoza alleges that he asked Mr. Kuehn about his application for

16  transfer in May 2015, and Mr. Kuehn informed him that he had been made aware that

17  there were "issues with" Mr. Espinoza.  (*See* Espinoza Decl. ¶ 26.)  Although Mr.

18  Espinoza asserts that Mr. Kuehn did not expound on what the "issues" were (*see id.*), Mr.

19  Espinoza had notice as of at least May 2015 that the Motorcycle Unit had identified

20  issues with his record, which contributed to the delay in his transfer to the Motorcycle

21  Unit.  This explanation provided to Mr. Espinoza in 2015 is entirely consistent with

22  Defendants' allegations that Mr. Espinoza's disciplinary record slowed his transfer.

1   Further, although there is no evidence that SPD informed Mr. Espinoza that his

2   disciplinary record remained a problem in 2016, the evidence shows that Mr. Espinoza's

3   disciplinary record resulted in the Motorcycle Unit ranking him lower than other officers

4   at that time, which is in line with the explanations SPD provided in this lawsuit.  (*See* 1st

5   Seals Decl. ¶ 44, Ex. 43 at SCL-Espinoza001213-14.)

6          Finally, the fact that SPD transferred Mr. Espinoza to the Motorcycle Unit in July

7   2018—10 months after he filed notice of his tort claim against SPD (*see id.* ¶ 55, Ex.

8   54)—is not evidence that SPD's explanation that his disciplinary record delayed his

9   transfer is inconsistent and does not suggest that Defendants' true motivation for the

10  delay was anti-military animus.  In 2015 and 2016, the Motorcycle Unit placed other

11  officers ahead of Mr. Espinoza on the transfer list and cited the frequency of his volunteer

12  work and "recent OPA findings" as justifications for placing him lower on the list at that

13  time.  (*See id.*; *id.* ¶ 46, Ex. 45; *id.* ¶ 40, Ex. 39.)  By June 2018, the Motorcycle Unit

14  ranked Mr. Espinoza as the top available candidate.  (*See id.* ¶ 49, Ex. 48; *id.* ¶ 50, Ex. 49

15  (noting that Mr. Espinoza was "[number] 1 on traffic list (motors) to come in).)  Notably,

16  by June 2018, the top six candidates from the Motorcycle Unit's September 2016

17  rankings—all of whom were ranked ahead of Mr. Espinoza at that time—were no longer

18  on the ranking list.  (*Compare id*. ¶ 44, Ex. 43 at SCL-Espinoza001213-14 *with id.* ¶ 49,

19  Ex. 48.)  Moreover, in the same email where SPD ranked Mr. Espinoza as the top

20  available transfer candidate, the Traffic Section Commander noted that the Motorcycle

21  Unit believed that next candidate in should be an officer who had "been on the wait list

22  the longest," which suggests that the seniority of an officer's transfer request impacted

1  the unit's ranking decisions.  (*See id.* ¶ 49, Ex. 48.)  This is consistent with Defendants'

2  explanation that Mr. Espinoza was transferred in 2018 because he had eventually become

3  the top candidate and it was his turn to be transferred.  In contrast, Mr. Espinoza, who

4  bears the burden to show that Defendants' acted with anti-military animus when they

5  delayed his transfer to the Motorcycle Unit, *see* 38 U.S.C. § 4311(c), has no evidence

6  beyond his own conclusory testimony to support his belief that his low ranking on the

7  2015 and 2016 transfer list was due to anti-military animus.

8                          iii.      Corporate Atmosphere of Discrimination

9          The court rejects Mr. Espinoza's argument that it should consider allegations from

10  Mr. Sackman and his lawsuits against SPD as evidence that SPD acted with anti-military

11  animus in this case.  (*See* MSJ Resp. at 19.)  Mr. Espinoza alleges that SPD discriminated

12  and retaliated against him by delaying his transfer to the Motorcycle Unit.  (*See* MSJ

13  Resp. at 16.)  Mr. Sackman's lawsuit against SPD and his belief that Mr. Espinoza's

14  claims of discrimination are consistent with his experience at SPD have no relevance to

15  those claims.  Mr. Sackman is a captain at SPD, not an officer like Mr. Espinoza (*see*

16  Sackman Decl. ¶ 3); outside of alleging that he "knows" Mr. Espinoza and is "aware" of

17  his allegations, Mr. Sackman does not purport to have any direct knowledge of Mr.

18  Espinoza's employment circumstances (*see id.* ¶ 10); Mr. Sackman does not allege that

19  he was employed in Mr. Espinoza's precinct (*see generally id.*); and Mr. Sackman does

20  not allege that he had any of the same supervisors, like Mr. Mahaffey, that Mr. Espinoza

21  alleges discriminated against him (*see generally id.*).  Mr. Sackman's lawsuit settled

22  without any admission of liability.  (*See id.* ¶ 4; *see also id.* at 12-16 (Mr. Sackman's

1  settlement agreement).)  Thus, even if Mr. Sackman's lawsuit was relevant to Mr.

2  Espinoza's lawsuit, Mr. Sackman's complaint and the statements about his lawsuit in his

3  declaration constitute nothing more than unverified allegations of discrimination.

4  Finally, the email chain Mr. Espinoza repeatedly cites as evidence of a "corporate

5  atmosphere of discrimination" at SPD (*see* Tymczyszyn Decl. ¶ 3, Ex. H) relates to Mr.

6  Sackman, not Mr. Espinoza, and was sent between two SPD supervisors who were never

7  in Mr. Espinoza's chain of command (*see* 1st Seals Decl. ¶ 6, Ex. 5 at RFA 16-17); *see*

8  *also Smith v. Vill. of Downers Grove*, No. 18-CV-05649, 2020 WL 1491177, at *8 (N.D.

9  Ill. Mar. 26, 2020) ("Simply alleging a general 'bad taste' within a department is not

10  enough to allow a reasonable jury to infer that [the plaintiff's] *supervisors* (1) had that

11  same bad taste with regard to military service and (2) acted on that animus when they

12  made the [adverse employment action at issue].").

13      In sum, Mr. Espinoza has not identified any relevant, admissible evidence that

14  there was a "corporate atmosphere of discrimination" at SPD.  Thus, the court rejects this

15  basis for inferring that SPD acted with discriminatory motive when it delayed transferring

16  Mr. Espinoza to the Motorcycle Unit.

17                    iv.      Dissimilar Treatment of Similarly Situated Individuals

18      Mr. Espinoza's argument that Defendants treated "similarly situated"

19  non-reservists differently than Mr. Espinoza regarding transfer to the Motorcycle Unit

20  actually highlights a crucial evidentiary shortcoming in Mr. Espinoza's case.  Mr.

21  Espinoza submits no evidence that any of the other officers that SPD transferred to the

22  Motorcycle Unit instead of him were similarly situated to Mr. Espinoza.  In the related

context of Title VII discrimination claims, the Ninth Circuit requires that plaintiffs show

that they are similar to other employees who received more favorable treatment "in all

material respects" to show that the employees are similarly situated.  *See Moran v. Selig*,

447 F.3d 748, 755 (9th Cir. 2006).  "Generally, we have determined that 'individuals are

similarly situated when they have similar jobs and display similar conduct.'"  *Hawn v.*

*Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (quoting *Vasquez v. Cty. of*

*Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)).  Here, Mr. Espinoza summarily declares

that he is similarly situated to the other SPD employees who took the August 2012

Motorcycle Unit training based solely on the fact that the officers all took the same

Motorcycle Unit training course.  (*See* MSJ Resp. at 3, 7-8.)  As discussed above,

however, SPD policy listed 15 different criteria for transfer to the Motorcycle Unit.  (*See*

1st Seals Decl. ¶ 26, Ex. 25.)  Passing the Motorcycle Unit training course is just one of

those 15 factors.[14]  (*See id.*)  Mr. Espinoza submits no evidence about the other officers

who took the August 2012 training course that would allow the court or a jury to

conclude that these officers are similarly situated to Mr. Espinoza with respect to any of

the other 14 factors the Motorcycle Unit considered. (*See generally* MSJ Resp.)  Indeed,

Mr. Espinoza does not even provide affirmative evidence beyond conclusory allegations

in his declaration about the military status—or lack thereof—of these other officers.  (*See*

---

[14] Mr. Espinoza repeatedly contends that one of the officers in his training class, Eric
Daylong, failed to pass the August 2012 Motorcycle Unit training course but was still transferred
to the Motorcycle Unit before Mr. Espinoza.  (*See, e.g.*, MSJ Resp. at 7.)  However, even if Mr.
Daylong failed the training course in August 2012, by December 2015, Mr. Daylong had passed
the training course.  (*See* 1st Seals Decl. ¶ 40, Ex. 39 (noting that Mr. Daylong had "successfully
completed the basic police motorcycle operators course").)

1   *id.* at 7; Espinoza Decl. ¶ 32.)  Instead, he concludes that these other officers were not

2   members of the military reserves based solely on Defendants' discovery response that

3   they lacked sufficient information to admit or deny that the five officers who took the

4   August 2012 training course were members of the military reserves.  (*See* MSJ Resp. at 7

5   (citing Tymczyszyn Decl. ¶ 11, Ex. E at 1-2).).

6        Although Mr. Espinoza failed to provide even basic information about the five

7   officers who took the August 2012 Motorcycle Unit training with him—such as rank,

8   length of service time, or even military status—Defendants submit the disciplinary

9   records for those five officers.  (*See* 1st Seals Decl. ¶ 51, Ex. 50.)  At the time he was

10   transferred to the Motorcycle Unit, Mr. Ogard had two disciplinary notices in his file,

11   both of which were more than 10 years old:  (1) a 1990 reprimand for unnecessary use of

12   force during an arrest;[15] and (2) a one-day suspension and transfer to a different position

13   for using SPD equipment for an inappropriate purpose in 2003.  (*See id.* at

14   SCL-Espinoza087825-26.)  Mr. Daylong had one 2006 reprimand in his file for a

15   preventable vehicle accident.  (*See id.* at SCL-Espinoza037451.)  The other three officers

16   who took the August 2012 training course—Roy Ellis, Steve Mathisen, and Matt

17   Diezsi—had no disciplinary records at all.  (*See id.*)  Similarly, Gregory Rice, Gary

18   Davenport, and Arthur Garza—who were ranked ahead of Mr. Espinoza on the

19   Motorcycle Unit's transfer rankings in 2015 and 2016 (*see id.* ¶¶ 40, 44, Exs. 39, 43)—

20

21   _____

22   [15] The fact that Mr. Ogard has a 1990 reprimand in his file suggests that he was employed at SPD for at least eight years longer than Mr. Espinoza at the time Mr. Ogard was promoted.  (*See* Espinoza Decl. ¶ 3.)

1   had no disciplinary records.  (*See id.* ¶ 51, Ex. 50.)  Thus, not only did Mr. Espinoza fail

2   to provide evidence that the officers who took the August 2012 training course with him

3   were similarly situated based on the selection criteria for the Motorcycle Unit,

4   Defendants submitted disciplinary evidence showing that these officers were more

5   favorably suited for selection to the Motorcycle Unit than Mr. Espinoza.[16]

6            v.  "Other Violations" of USERRA

7        Mr. Espinoza argues that the court should infer that Mr. Espinoza's delayed

8   transfer to the Motorcycle Unit was due to SPD's anti-military animus because SPD

9   engaged in other practices that violated USERRA.  (*See* MSJ Resp. at 19.)  The court

10  disagrees that SPD violated other provisions of USERRA.  First, Mr. Espinoza

11  acknowledges that he received all the service credits he is entitled to after he requested

12  that DRS update his service credit amounts in 2017.  (*See* Espinoza Dep. at 165:3-16;

13  173:24-174:2.)  Thus, his complaint about service credits is that SPD did not provide him

14  with service credits for his periods of military deployment until he asked for them and

15  provided the necessary supporting documentation.

16       Mr. Espinoza has not identified any provision of USERRA or Washington law that

17  required SPD to automatically credit Mr. Espinoza with service credits for his periods of

18

19       [16] Mr. Espinoza's passing reference to his argument that he was denied transfer to the
     Southwest Precinct at the same time SPD granted transfer requests from other similarly situated
20   employees (*see* MSJ Resp. at 19) fails for a similar lack of proof about whether these other
     officers were similarly situated.  Further, the available evidence shows that the Assistant Chief of
21   Patrol Operations approved Mr. Espinoza's transfer request, but Mr. Espinoza was not
     transferred because the Southwest Precinct wanted an officer for the third watch and Mr.
22   Espinoza wanted to stay on second watch.  (*See* 1st Seals Decl. ¶ 38, Ex. 37; Espinoza Dep. at
     127:18-128:3.)

1  military deployment.  (*See generally* MSJ Resp.)  USERRA states that reemployed

2  service members "shall be treated as not having incurred a break in service" for pension

3  purposes, *see* 38 U.S.C. § 4318(a)(2)(A), but specifically allows employers to require

4  documentation of military leave prior to providing pension benefits under

5  § 4318(a)(2)(A), *see* 38 U.S.C. § 4312(f)(3)(B).  Similarly, Washington law states that

6  military members who leave the employ of an employer to perform military service

7  "shall be entitled to retirement system service credit for up to five years of military

8  service."  RCW 41.40.710(4).  If the reemployed military member wishes to obtain

9  service credits at no cost, the member must provide "proof that the member's interruptive

10  military service was during a period of war."  RCW 41.40.710(4)(a)(iv).  When Mr.

11  Espinoza contacted DRS to inquire about his service credits, DRS requested the relevant

12  documentation to establish that Mr. Espinoza's military service was during a period of

13  war.  (*See* 1st Seals Decl. ¶ 9, Ex. 8 at Espinoza 0049.)  Once Mr. Espinoza provided that

14  information, DRS approved his request for service credits, SPD made the necessary

15  contributions, and Mr. Espinoza received his service credits.  (*See id.* ¶¶ 7, 13, 14, Exs. 6,

16  12-13.)  Thus, DRS and SPD's response to Mr. Espinoza's request for service credits was

17  fully consistent with USERRA and Washington law and is not evidence that SPD delayed

18  Mr. Espinoza's transfer based on anti-military animus.

19      Mr. Espinoza's allegation that SPD required him to get "supervisor approval" to

20  perform military service contorts the available facts in the record.  Regulations

21  promulgated under USERRA state that an employee is not required to "ask for or get his

22  or her employer's permission" to perform military service.  *See* 20 C.F.R. § 1002.87.

1   However, the employee is required to "give the employer notice of pending service."  *See*

2   *id.*  The problem with Mr. Espinoza's argument that SPD required him to get approval to

3   perform military service is that he considers circling furlough days as his only option for

4   taking leave for military duty.  The undisputed facts in the record showed that SPD

5   officers had a number of options for taking leave from SPD to perform military duty,

6   including:  (1) up to 21 days of paid military leave per year; (2) discretionary furlough

7   days; (3) unpaid leave; or (4) circling furlough days.  (*See* Mahaffey Dep at 68:24-69:6;

8   Zwaschka Dep. at 23:6-25:2.)  SPD policy required that all SPD officers obtain

9   supervisor approval to circle furlough days because circling furlough days resulted in an

10   officer "trading" a regularly scheduled day off for a regularly scheduled work day, which

11   created staffing challenges if supervisors did not properly account for the traded days.

12   (*See* 1st Seals Decl. ¶ 52, Ex. 51 at § 4.010(12); Espinoza Decl. at 126:21-127:7;

13   Mahaffey Dep. at 71:24-73:4; Zwaschka Dep. at 25:19-26:19.)  The fact that Mr.

14   Espinoza asserts that he prefers to circle furlough days to perform military service (*see*

15   Espinoza Decl. ¶ 14) does not mean SPD's policy that supervisors must approve an

16   officer's request to circle furlough days violates USERRA.  Unlike circling furlough

17   days, an officer's 21 days of paid military leave and discretionary furlough days could be

18   used at an officer's discretion without any requirement for supervisor approval.[17]  (*See*

19   Zwaschka Dep. at 23:6-20.)

20   *//*

21

22                     [17] No evidence in the record details the process for requesting unpaid leave.

1     Critically, although Mr. Espinoza takes issue with the policy for circling furlough

2   days at a high level, Mr. Espinoza does not point to a single instance in which SPD

3   required him to seek permission to perform military service or prevented him from

4   circling a furlough day for military service.  (*See generally* MSJ Resp.)  On the other

5   hand, Mr. Mahaffey and Mr. Zwaschka, who provided the only evidence in the record on

6   this topic, both testified that SPD accommodated officers who needed leave to perform

7   military duty.  (*See* Mahaffey Dep. at 69:7-22; Zwaschka Dep. at 25:3-18.)  Thus, the

8   undisputed evidence shows that SPD's practices regarding leave for military duty did not

9   run afoul of USERRA.

10                    vi.  "Related Anti-Military Animus"

11     Finally, the court rejects Mr. Espinoza's arguments that other evidence of

12   "[r]elated anti-military animus" that Mr. Espinoza suffered at SPD can be construed as

13   evidence that SPD delayed Mr. Espinoza's request for transfer to the Motorcycle Unit

14   due to anti-military animus.  (*See* MSJ Resp. at 19.)  Mr. Espinoza presents no evidence

15   of any "related anti-military animus" that the court has not already addressed.  Mr.

16   Espinoza submits no evidence to corroborate his allegations that SPD's decisions not to

17   promote him to the Bicycle, Narcotics, Bomb, or Homeland Security Units had any

18   connection to anti-military animus or to his requests to transfer to the Motorcycle Unit.

19   (*See generally* MSJ Resp.)  Similarly, Mr. Espinoza's opposition brief does not offer any

20   argument about the relevance of the September 2015 Ride the Ducks accident.  (*See*

21   *generally id.*; *See also supra* § II.B.8.)  Mr. Espinoza makes a conclusory statement that

22   "others [at SPD] express[ed] frustration with [Mr.] Espinoza's military service."  (*See*

1    MSJ Resp. at 19.)  But the only other individual addressed in Mr. Espinoza's briefing is

2    Mr. Zwaschka, who Mr. Espinoza asserts spoke to him about circling furlough days in a

3    tone that led Mr. Espinoza to believe that [SPD] was frustrated with the amount of

4    military leave that [Mr. Espinoza] was taking."  (*See* MSJ Resp. at 10; Espinoza Decl.

5    ¶ 14.)  This allegation is both speculative and conclusory.  Moreover, Mr. Espinoza fails

6    to draw a meaningful connection to Mr. Zwaschka's expressed frustration and SPD's

7    decision to delay his transfer to the Motorcycle Unit.  (*See generally* MSJ Resp.)  Thus,

8    the court concludes that there is no cognizable evidence that Mr. Espinoza suffered

9    "[r]elated anti-military animus" at SPD related to his claims in this case.

10                      vii.    Summary

11          The court concludes that Mr. Espinoza has failed to establish a genuine dispute of

12   material fact regarding whether his military service was a "motivating factor" behind

13   SPD's delay in transferring him to the Motorcycle Unit as required by 38 U.S.C.

14   § 4311(c).  Even when the evidence is viewed in the light most favorable to Mr.

15   Espinoza—as it must be for summary judgment—Mr. Espinoza failed to submit evidence

16   beyond his own conclusory allegations showing that SPD "relied on, took into account,

17   considered, or conditioned its decision" on Mr. Espinoza's status as a member of

18   USMCR.  *See Campbell*, 2012 WL 13020051, at *2; Accordingly, the court GRANTS

19   Defendants' motion for summary judgment on Mr. Espinoza's retaliation and

20   discrimination claims under 38 U.S.C. § 4311.[18]  *See, e.g.*, *McConnell*, 944 F.3d at 990

21

22          [18] Because Mr. Espinoza fails to carry his initial burden to show by a preponderance of
     the evidence that his military status was a "motivating factor" in SPD's decision-making, the

1   ("[S]ummary judgment [is] appropriate here because McConnell has failed to present

2   sufficient evidence to make a threshold showing that his military status was a motivating

3   factor in Anixter's decision to fire him."); *Ward v. United Parcel Serv.*, 580 F. App'x

4   735, 738 (11th Cir. 2014) ("Here, Ward did not present sufficient evidence that would

5   allow a reasonable jury to find that his military service was a motivating factor in UPS's

6   failure to employ him between October 2009 and January 2011.  Notably, he failed to

7   offer evidence of express hostility towards members of the military or disparate treatment

8   of similarly situated employees.  At best, Ward attempted to show inconsistencies in

9   UPS's proffered reasons for its actions.  But the evidence Ward offered did not show a

10  material dispute of fact."); *De Cuir v. Cty. of Los Angeles*, 223 F. App'x 639, 640 (9th

11  Cir. 2007) ("[T]he district court properly granted summary judgment because De Cuir

12  failed to create a triable issue as to whether his veteran status was a "motivating factor" in

13  defendants' action.").

14          2.      Mr. Espinoza's Other USERRA Claims

15          Mr. Espinoza's complaint alleges three additional USERRA claims; (1) denial of

16  seniority benefits in violation of 38 U.S.C. § 4316 of USERRA; (2) failure to contribute

17  to a pension plan in violation of 38 U.S.C. § 4318 of USERRA; and (3) willful violation

18  of USERRA in violation of 38 U.S.C. § 4323.  (*See* Am. Compl. at 14-16.)  Although

19  SPD argued that the court should grant summary judgment on each of these causes of

20

21  ─────────────────

    court need not consider whether Defendants carried their burden to establish their affirmative
    defense that SPD "would have taken the same action without regard to [Mr. Espinoza's]
22  protected status."  *Huhmann*, 874 F.3d at 1105 (quoting *Wallace*, 479 F.3d 624).

1    action (*see* MSJ at 16-17, 30), Mr. Espinoza offered no argument in support of these

2    claims in his opposition brief (*see generally* MSJ Resp.).

3          Defendants are entitled to summary judgment on each of these remaining

4    USERRA claims.  Section 4316 of USERRA states that reemployed military members

5    are entitled to "seniority and other rights and benefits determined by seniority" that the

6    member would have received had the member remained continuously employed.  38

7    U.S.C. § 4316.  This claim fails because Mr. Espinoza makes no effort to identify any

8    "seniority" rights that SPD did not grant him.  (*See generally* MSJ Resp.)  As discussed

9    above, SPD's treatment of Mr. Espinoza's request for service credits did not violate 38

10   U.S.C. § 4318.  *See supra* § III.B.2.v.  Accordingly, SPD is entitled to judgment as a

11   matter of law on Mr. Espinoza's § 4318 claim.  Finally, because each of Mr. Espinoza's

12   USERRA claims fail, Mr. Espinoza's claim for willful violation of USERRA under 38

13   U.S.C. § 4323 also necessarily fails.  *See* 38 U.S.C. § 4323(d)(1)(C).  Thus, the court

14   GRANTS summary judgment on Mr. Espinoza's claims for (1) denial of seniority

15   benefits in violation of 38 U.S.C. § 4316 of USERRA; (2) failure to contribute to a

16   pension plan in violation of 38 U.S.C. § 4318 of USERRA; and (3) willful violation of

17   USERRA in violation of 38 U.S.C. § 4323.

18         3.    Mr. Espinoza's WLAD Claim

19         Mr. Espinoza's claim for discrimination in violation of WLAD fails for the same

20   reasons that his USERRA discrimination and retaliation claims fail.  "WLAD makes it an

21   unfair practice for any person acting in the interests of an employer to discriminate

22   against an employee in the terms and conditions of employment because of military

1   status." *Fennell v. Pac. Mar. Ass'n*, No. CV C16-5933RSL, 2017 WL 1543249, at *1

2   (W.D. Wash. Apr. 28, 2017) (citing RCW 49.60.040(11) and RCW 49.60.180(3)).  To

3   overcome summary judgment on a WLAD discrimination claim, an employee "needs to

4   show only that a reasonable jury could find that the plaintiff's protected trait was a

5   substantial factor motivating the employer's adverse actions."  *See Scrivener v. Clark*

6   *Coll.*, 334 P.3d 541, 545 (Wash. 2014).

7          Where an employee lacks direct evidence of discrimination, a WLAD claim

8   proceeds under the three-step *McDonnell Douglas* analysis.  *See id.* at 546; *see also*

9   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "Under the first prong of the

10  *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a

11  *prima facie* case of discrimination, which creates a presumption of discrimination."

12  *Scrivener*, 334 P.3d at 546 (citations omitted).  "Once the plaintiff establishes a *prima*

13  *facie* case, the burden of production shifts to the employer to articulate a legitimate,

14  nondiscriminatory reason for the adverse employment action."  *Id.* (citations omitted).

15  "If the Defendant meets this burden, the third prong of the *McDonnell Douglas* test

16  requires the Plaintiff to produce sufficient evidence that Defendant's alleged

17  nondiscriminatory reason for [the employment action] was a pretext."  *Id.* (citations

18  omitted).

19         The court concludes that Mr. Espinoza fails to carry his burden to establish a

20  *prima facie* case of discrimination.  To establish a *prima facie* discrimination claim under

21  the *McDonnell Douglas* framework, Mr. Espinoza must show that he:  "(1) belongs to the

22  protected class; (2) was qualified for the position; (3) was subject to an adverse

employment action; and (4) similarly situated employees outside the protected class were treated more favorably." *See Ellorin v. Applied Finishing, Inc.*, 996 F. Supp. 2d 1070, 1092 (W.D. Wash. 2014) (citing *Chuang v. University of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)).  In its analysis of Mr. Espinoza's USERRA claim, the court addressed Mr. Espinoza's failure to show that similarly situated employees were treated more favorably than him.  *See supra* § III.B.1.b.iv.  Mr. Espinoza's failure to provide evidence that SPD favored similarly situated employees also dooms his WLAD claim. *See, e.g.*, *McElwain v. Boeing Co.*, 244 F. Supp. 3d 1093, 1100 (W.D. Wash. 2017) (granting summary judgment on WLAD claim based on plaintiff's failure to provide more than "bare allegation" of similarly situated employees receiving favorable treatment).  Thus, the court GRANTS Defendants' motion for summary judgment on Mr. Espinoza's WLAD claim.

Although Mr. Espinoza's failure to establish a *prima facie* case of discrimination under WLAD is fatal to his claim, the court also concludes that Defendants' met their burden to articulate "legitimate, nondiscriminatory reason[s]" for SPD's delay in transferring Mr. Espinoza by providing evidence that Mr. Espinoza's disciplinary record caused him to be ranked lower on the Motorcycle Unit's transfer list.  (*See* MSJ at 26-29); *supra* § III.B.1.b; *Scrivener*, 334 P.3d at 546.  Additionally, based on the court's analysis of the merits of Mr. Espinoza's USERRA claim, *see supra* § III.B.1.b, the court concludes that Mr. Espinoza fails to submit any evidence that Defendants' articulated nondiscriminatory reason for his delayed transfer was pretextual.  Thus, his WLAD claim also fails at the third step of the *McDonnell Douglas* framework.

1    **C.    Defendants' *Daubert* Motion**

2         The contents of Mr. West's report and deposition do not change the court's

3    determination the Defendants are entitled to summary judgment on each of Mr.

4    Espinoza's claims.  Mr. West's reports relate solely to the amount of Mr. Espinoza's

5    alleged damages.  (*See* Lee Decl. ¶¶ 2-3, 6-7, Exs. 1-2, 5-6.)  Damages are not relevant to

6    Defendants' summary judgment motion or the court's analysis of that motion.  Thus,

7    because Mr. West's reports, even if fully admitted, would not change the court's

8    conclusion on summary judgment, the court DENIES as moot Defendants' motion to

9    exclude Mr. West.

10                    **IV.    CONCLUSION**

11        For the foregoing reasons, the court GRANTS Defendants' motion for summary

12   judgment (Dkt. # 75), and DENIES as moot Defendants' motion to exclude (Dkt. # 73)

13   and Defendants' motion to strike (*see* MSJ Reply at 2-7).

14        Dated this 1st day of May, 2020.

15

16

17   JAMES L. ROBART
     United States District Judge

18

19

20

21

22